Filed: November 10, 2011

IN THE SUPREME COURT OF THE STATE OF OREGON

DARELL KASEBERG,

Petitioner on Review,

v.

DAVIS WRIGHT TREMAINE, LLP,
a Washington limited liability partnership,

Respondent on Review.

(CC 071113766; CA A141824; SC S059154)

En Banc

On review from the Court of Appeals.*

Argued and submitted September 21, 2011.

Paul R. Rundle, The Rundle Law Firm, Vancouver, Washington, argued the cause for petitioner on review. Daniel Lindahl, Lindahl Law Firm, PC, Portland, filed the petition for petitioner. With him on the petition was Paul Rundle.

Xin Xu, Kennedy, Watts, Arellano & Ricks LLP, Portland, argued the cause and filed the brief for respondent on review.

Michael A. Greene, Portland, argued the cause for petitioner on review and filed a brief for *amicus curiae* Oregon Trial Lawyers Association.

WALTERS, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

*Appeal from Multnomah County Circuit Court, Charles E. Corrigan, Judge Pro Tem. 240 Or App 352, 247 P3d 773 (2010).

WALTERS, J.

In this legal malpractice case, we apply the "discovery rule" and decide that the trial court erred in concluding, on defendant's motion for summary judgment, that plaintiff's claim was time-barred.

We state the facts adduced by the parties on summary judgment in the light most favorable to plaintiff, the nonmoving party. *Hampton Tree Farms, Inc. v. Jewett*, 320 Or 599, 613, 892 P2d 683 (1995). In 2000, plaintiff, a farmer for over 30 years, was, and had been, farming two properties -- Grass Valley Ranch, which he owned, and Antelope Ranch, which he leased to farm. Other farmers, the Wheelers, agreed to loan plaintiff needed capital. To secure repayment of the loan, plaintiff agreed to deed the Grass Valley Ranch to the Wheelers, and the Wheelers agreed to lease the Grass Valley Ranch back to plaintiff and to grant him an option to purchase upon repayment. To secure payment of the lease obligations, the Wheelers placed a lien against the proceeds of the sale of crops grown on the Grass Valley and the Antelope ranches.

After the Wheelers had made at least partial advances and plaintiff had deeded the Grass Valley Ranch to them, disagreements arose. The Wheelers claimed that plaintiff was in arrears on repayments and plaintiff claimed that the Wheelers had failed to advance promised funds necessary to the success of the venture. In 2001, plaintiff filed for bankruptcy, and the parties also disagreed about the effect of that proceeding on their contractual obligations and plaintiff's option to repurchase the Grass Valley Ranch. The Wheelers brought two actions against plaintiff -- one for breach of contract, the other to evict plaintiff from the Grass Valley Ranch. Plaintiff hired a lawyer, Iain Levie, then

2

employed with defendant, to represent him in the lawsuits.

When the eviction trial began on January 30, 2002, both parties had an incentive to resolve their disputes. Plaintiff wanted to continue to farm the Antelope Ranch and to plant wheat on that property in the coming 2002 season. Plaintiff had planted barley there in the 2001 season, but he wanted to substitute wheat in the 2002 season because the government-backed insurance coverage for wheat planted that year was higher than that for barley. To obtain the higher insurance benefit, however, plaintiff was required to plant the wheat by February 15, 2002. (The planting deadline for government-backed insurance for barley was March 15, 2002.) Plaintiff had received confirmation from his bank that it was ready to advance the necessary funds, but the loan was contingent on removal of the Wheelers' crop lien. Plaintiff wanted the Wheelers to release their lien in time to enable him to obtain the funds and plant wheat on the Antelope Ranch property before the February 15 deadline. The Wheelers had a similar incentive to reach an agreement with plaintiff. The Wheelers wanted to plant wheat on the Grass Valley Ranch, and, if they could obtain immediate possession of that property, they too could meet the February 15 deadline and be assured of maximum insurance benefits.

Before, and on the day of, the eviction trial, plaintiff told Levie that he would be willing to give up his right to repurchase the Grass Valley Ranch if the Wheelers would remove their crop lien in time for plaintiff to meet the February 15 planting deadline. During the lunch break, Levie met with the Wheelers' lawyer and they negotiated an oral settlement agreement that they subsequently reported to the court and

3

recited on the record. Plaintiff was not present at that meeting. As recited, the agreement gave the Grass Valley Ranch to the Wheelers and permitted plaintiff to farm the Antelope Ranch. The agreement required plaintiff to (1) relinquish any interest or claim of interest in, and surrender possession of, the Grass Valley Ranch; (2) disclose by February 11, 2002, all government payments and other funds that he received from crop sales from 2000 through January 30, 2002; (3) immediately endorse and deliver to the Wheelers the crop insurance proceeds for 2000 and 2001; and (4) remove his possessions from the two residences on Grass Valley Ranch by February 28, 2002 and within 45 days after the settlement, respectively. The agreement further provided that a judgment of restitution would issue. In exchange, the Wheelers agreed to dismiss their breach of contract action and to "execute whatever documents [were] necessary to remove all liens from the Antelope property, with respect to any future * * * farming activities." The Wheelers also agreed that they would not "do anything through their own actions which would interfere with [plaintiff's] ability to continue ranching activities anywhere other than * * * the Grass Valley property." The court asked the parties whether they stipulated to the agreement as recited and they indicated that they did. At that time, Mr. Wheeler understood that plaintiff intended to plant wheat on the Antelope Ranch before the February 15 deadline, that plaintiff needed financing to do so, and that plaintiff could not get that financing until the Wheelers removed or subordinated their crop lien.

In the days and weeks following the January 30 agreement, plaintiff learned, and informed Levie, that the Wheelers had not removed the crop lien. Levie responded that the Wheelers were in breach of the settlement agreement. On February

4

15, 2002, the Wheelers still had not removed the crop lien, and plaintiff was unable to timely plant wheat on the Antelope Ranch as he had intended.

On February 24, 2002, the parties entered into an eight-page written settlement agreement. The agreement provided that it was "effective January 30, 2002," and contained the following recital:

> "The parties have agreed to settle the claims arising out of the FED Action and the Contract Action. The terms of the parties' settlement were placed on the record before the court on January 30, 2002."

One of the terms of the written settlement agreement provided:

> "7.2 Subject to [plaintiff's] performance of his obligations hereunder and the terms of this Agreement, Wheelers shall have no interest or right to claim any interest in any crop proceeds or any government support payments due with respect to the Antelope Property for crops grown during 2002 or thereafter, and Wheelers shall on request execute such documents as may be necessary to release such lien claims of record. Wheelers agree not to initiate any public comments about [plaintiff] which would demean his reputation. However, Wheelers shall be entitled to fully answer all questions put to them about their relationship with [plaintiff]."

Some time in March 2002, the Wheelers subordinated the crop lien, permitting plaintiff to obtain a bank loan and to plant barley in time to meet the later government insurance deadline applicable to barley. However, because full insurance coverage for barley was less than that for wheat, plaintiff was aware that he could suffer a monetary loss.

In February, March, April, and May 2002, plaintiff talked with Levie about what recourse he had as a result of the Wheelers' untimely action. Levie told plaintiff that plaintiff had a "great case" against the Wheelers. In March 2002 and thereafter, Levie said that he would represent plaintiff against the Wheelers and encouraged plaintiff

to believe that he would prevail in that litigation. Levie did not suggest to plaintiff that Levie had been negligent in any regard or that his representation had contributed to plaintiff's damages. It did not occur to plaintiff that Levie was in any way responsible for those damages and, in fact, Levie's statements about the Wheelers' liability had the opposite effect -- plaintiff was optimistic about recovering his anticipated losses from the Wheelers and understood that he would have six years to do so. Levie told plaintiff that the applicable statute of limitations -- the limitations period for breach of contract -- was six years.

Sometime later, plaintiff learned that Levie was no longer employed by defendant. At that time, plaintiff again had discussions with Levie about pursuing the Wheelers for breach of contract. Levie did not change his prior position or advice. Eventually, however, Levie suggested that plaintiff hire a different lawyer to file a claim against the Wheelers. Plaintiff was referred to a new lawyer, who met with him in approximately late November or early December 2006. After several weeks of investigation by that lawyer, plaintiff learned that "such a claim may not be or may no longer be viable based on some problems that appeared to be related to [his representation by defendant]." That was the first time that it occurred to plaintiff that anyone other than the Wheelers could be responsible and liable for his damages.

Plaintiff filed this action against defendant on November 19, 2007. Plaintiff alleged that defendant, through Levie's acts or omissions, was negligent in the

6

negotiation and expression of the oral settlement agreement.[1]  In alleging defendant's negligence, plaintiff used a defined phrase, "the Missing Term," to mean

> "any term requiring that removal of the Antelope Ranch lien by the Wheelers be accomplished immediately or within such other deadline as would have been sufficient to allow time for [plaintiff] to plant wheat on the Antelope Ranch within the February 15, 2002 deadline, and * * * such other related provision or provisions in the Oral Settlement reasonably necessary or appropriate to make such term effective and enforceable, including but not limited to a 'time-is-of-the-essence' clause[.]"

Plaintiff alleged that defendant (1) failed to negotiate for inclusion of the Missing Term in the oral settlement; (2) failed to express the Missing Term as a term of the oral settlement agreement; and (3) failed to advise plaintiff regarding the benefits of negotiating and the consequence of omitting the Missing Term.  Plaintiff alleged that if defendant had taken the actions that it failed to take, the Wheelers would not have objected to including the Missing Term in the oral or written settlement agreement and would have voluntarily removed the crop lien by February 15 or been ordered by the court to do so.  Finally, plaintiff alleged that as a direct result of defendant's negligence, he was unable to plant wheat by the federal crop insurance deadline and suffered net lost profits of $269,414.51.

---

[1]     Plaintiff also alleged that defendant was negligent in failing to take action to enforce the oral settlement agreement.  However, after the trial court issued its written decision on defendant's motion for summary judgment, plaintiff stipulated that the trial court's decision as to plaintiff's allegations of negligent negotiation and expression effectively disposed of plaintiff's allegations as to negligent enforcement.  On appeal, the parties proceed in accordance with that stipulation and address only the merits of the trial court's decision on plaintiff's allegations of negligent negotiation and expression.  For that reason, we do not separately address plaintiff's allegations of negligent enforcement.

Defendant moved for summary judgment, contending that plaintiff's action was time-barred because plaintiff did not commence it within two years from the date of accrual. ORS 12.110(1). *See also Stevens v. Bispham*, 316 Or 221, 223, 851 P2d 556 (1993) (applying statute to legal malpractice claims). Defendant argued that plaintiff's action had accrued no later than February 15, 2002, when he knew that he would be unable to plant wheat on the Antelope Ranch in time to meet the insurance deadline and knew or should have known that defendant was a cause of that damage. Instead of filing his action within two years of that date, plaintiff had waited until November 20, 2007, nearly six years later, to file his action against defendant.

The trial court decided that the facts presented on summary judgment did not present a genuine issue of fact as to whether plaintiff knew or, in the exercise of reasonable care, should have known, more than two year before he filed this action, that defendant had failed to negotiate the Missing Term and have that term included in the oral settlement agreement and consequently, that plaintiff's action was time-barred. Plaintiff appealed and the Court of Appeals affirmed without opinion. Plaintiff sought review, which we allowed. The issue before us is whether there are genuine issues of material fact as to when plaintiff's malpractice action accrued and whether those facts precluded summary judgment for defendant. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997).

Before we analyze the proffered facts and the arguments that the parties make from those facts, we review the "discovery rule" that this court uses to determine when a claim for legal malpractice accrues. *Stevens,* 316 Or at 227; *U.S. Nat'l Bank v.*

8

*Davies,* 274 Or 663, 666, 548 P2d 966 (1976). The statute of limitations does not begin to run until the client knows or, in the exercise of reasonable care, should know "'every fact which it would be necessary for the [client] to prove * * * in order to support his right to judgment.'" *Stevens*, 316 Or at 227; *Davies*, 274 Or at 666-67 (both quoting Franks, Limitations of Actions 11 (1959)). The three elements of a claim for professional negligence are (1) harm, (2) causation, and (3) tortious conduct. *Gaston v. Parsons*, 318 Or 247, 256, 864 P2d 1319 (1994). Thus, a claim for legal negligence accrues "when the client both suffers damage and knows or, in the exercise of reasonable care, should know that 'the substantial damage actually suffered *was caused* by' the lawyer's acts or omissions." *Stevens,* 316 Or at 227 (quoting *Davies,* 274 Or at 670 (emphasis in original)).

The discovery rule applies an objective standard -- how a reasonable person of ordinary prudence would have acted in the same or a similar situation. *Gaston*, 318 Or at 256.[2] The discovery rule does not require actual knowledge; however, mere suspicion also is insufficient. *Id*. The statute of limitations begins to run when the plaintiff knows or, in the exercise of reasonable care, should have known facts that would make a reasonable person aware of a substantial possibility that each of the elements of a claim

---

[2] Although *Gaston* is a medical malpractice case, and the court interpreted a different statute of limitations, ORS 12.110(4), its discussion of the discovery rule is applicable here. In *Gaston*, the court interpreted ORS 12.110(4) to incorporate the same discovery rule that this court has recognized as applicable in actions governed by subsection (1) of that statute, including actions for legal malpractice. 318 Or at 253.

9

exists. *Id.*

Application of the discovery rule presents a factual question for determination by a jury unless the only conclusion that a jury could reach is that the plaintiff knew or should have known the critical facts at a specified time and did not file suit within the requisite time thereafter. *T. R. v. Boy Scouts of America*, 344 Or 282, 296, 181 P3d 758 (2008). As the following cases demonstrate, legal malpractice claims may present particular challenges for determining, as a matter of law, when the statute of limitations begins to run.

*Davies*, a legal malpractice case, presents one example. In *Davies*, the defendants advised the plaintiff's decedent to accept trust funds of a corporation in payment for his stock. The decedent did so, and, in 1971, the corporation sued the decedent, alleging that such use of the funds violated the law. In 1973, the decedent settled the lawsuit by paying $170,000 to the corporation. In 1974, the plaintiff filed a legal malpractice action against the defendants, seeking, as damages, the legal expenses he incurred in defending the suit by the corporation and the sum that he paid the corporation in settlement. The defendants contended that the decedent's claim against his attorneys accrued when the corporation sued him, "or, in any event, as soon thereafter as decedent could hire competent counsel and could ascertain whether the claim against him was likely to be a valid one[.]" 274 Or at 668.

There was no doubt, the court said, that the decedent had suffered damage at the time the corporation sued him. As of that date, the decedent was required to incur legal expenses to defend against the suit. What was not so clear, however, was whether

10

those damages were caused by the defendants' negligent advice.  The court observed that,

> "[i]n many situations[,] the closeness of the legal questions involved would
> make it impossible to ascertain until the ultimate determination of the case
> whether it was brought as the result of the attorney's bad advice or whether
> it was the result of a misapprehension on the part of the party who sued as
> to his legal rights."

*Id*. at 668.  Therefore, the court held, the statute of limitations did not necessarily accrue when the decedent was sued and there was a possibility that he had been the recipient of improper advice; accrual depended on "a 'later event' (the appearance of decedent's probable liability)."  *Id.* at 670.  In *Bollam v. Fireman's Fund Ins. Co.,* 302 Or 343, 350, 730 P2d 542 (1986), the court characterized the holding in *Davies* as follows:

> "This court held that on the record before it the limitations period did not
> run as a matter of law until the action between the client and corporation
> determined whether the attorneys' advice was incorrect."

As *Davies* demonstrates, when a client receives advice from a lawyer, the client does not necessarily act unreasonably in trusting that advice.  A lawyer is in a relationship of trust and confidence to a client.  *See In re Drake*, 292 Or 704, 713, 642 P2d 296 (1982) ("The relationship between lawyer and client is one of trust and confidence.").  When a potential tortfeasor is in a relationship of trust and confidence to a plaintiff and makes assurances to the plaintiff, those assurances may "have a bearing on whether a reasonable person would be aware of a substantial possibility of tortious conduct." *Gaston*, 318 Or at 257.  In *Gaston*, the plaintiff learned, after surgery, that his left arm was numb and did not function.  Although the plaintiff therefore knew that he had suffered some harm, the defendant, the plaintiff's surgeon, assured the plaintiff that the loss of function was temporary and that he would regain the use of his arm within six

11

months to two years. The question on appeal was whether a reasonable person in the plaintiff's position should have suspected the defendant's malpractice and made an investigation.

The court concluded that it could not decide that question as a matter of law. The court noted that symptoms may follow from surgery without necessarily indicating tortious conduct, and decided that, given the relationship of trust and confidence between the parties, the defendant's assurances raised a genuine question of fact and precluded summary judgment. *Id.* at 257-58.

Finally, as *Gaston* demonstrates, more than one person may be potentially responsible for a client's harm. Because the conduct that may give rise to a claim against the client's lawyer may be quite different from the conduct that may give rise to a claim against another actor, the client's awareness of the role of one potential tortfeasor may not necessarily alert the client to the role of the other. *T.R.,* 344 Or at 292. In *T.R.*, the plaintiff knew that a police officer, who was a city employee, had sexually abused him. However, the court held, that information did not necessarily alert the plaintiff to the possibility that the city itself had a role that could render plaintiff liable, under 42 USC section 1983, for the plaintiff's harm.[3] The court explained that, when two or more persons may have a role in causing a plaintiff's injury and the facts that should alert a plaintiff to a defendant's role are different as to each, the date of accrual also may be

---

[3] To establish a city's liability under Section 1983, a plaintiff must establish that the city has a policy, custom, or usage that violates a plaintiff's rights. *Id.* at 290.

12

different as to each. *Id.* at 292. When the plaintiff is aware that one person has caused harm to the plaintiff, the plaintiff's claim against another defendant accrues when (1) the plaintiff knows, or a reasonable person should know, that there is enough of a chance that the defendant had a role in causing the plaintiff's injury to require further investigation; and (2) an investigation would have revealed the defendant's role. *Id.* at 296. In *T.R.*, the plaintiff had questioned two other city officers about the abuser, and a jury could have found that the officers had "exhibited acceptance" of the abuser's conduct or had "discouraged any further inquiry." *Id.* at 298. The court concluded from that evidence that a jury could have found that the plaintiff reasonably believed that further inquiry would not be productive or reveal the city's role in causing his harm. *Id.* at 298-99.

With that background in mind, we turn to the facts adduced on summary judgment in this case. On February 15, 2002, plaintiff believed that the Wheelers were contractually obligated to remove their crop lien in time to enable him to plant wheat by the insurance deadline. Plaintiff knew both that they had not done so and that he would suffer economic harm as a result. Therefore, on that date, plaintiff knew or should have known that he had a claim against the Wheelers for breach of contract. The issue that this case presents is whether, as of that date, plaintiff also knew or, in the exercise of reasonable care, should have known, as a matter of law, that there was such a substantial possibility that Levie was negligent and that his negligence had a role in causing plaintiff's damages, that plaintiff should have conducted a further investigation that would have revealed Levie's role.

Defendant argues that plaintiff was present in court on January 30, 2002,

13

when the settlement agreement was recited on the record and that he knew, or reasonably should have known, on that date, that the settlement agreement did not include a requirement that the Wheelers remove their lien in time for him to meet the February 15 deadline. Moreover, defendant contends, immediately thereafter and over a number of days, plaintiff expressed multiple times to Levie that the Wheelers had not removed the lien and directed Levie to take action to get it removed. Plaintiff later testified, in response to deposition questions by defendant, that if Levie had asked the Wheelers to remove the lien, they would have done so. Consequently, defendant asserts, when the Wheelers did not act by February 15, plaintiff should have known that Levie had not done as directed and that his failure to do so could be a cause of plaintiff's harm. In defendant's words, plaintiff should have known that "*some* harm had been incurred and that he had *a* claim against [defendant]" (emphasis in original). A reasonable person, defendant argues, would not have slept on his rights and waited nearly six years to consult another lawyer; a reasonable person would have been aware of the substantial possibility that Levie had acted negligently and contributed to plaintiff's harm and immediately investigated his options.

Certainly, defendant is correct that a jury could draw the conclusions for which it argues. However, for the reasons we explain, a reasonable jury also could draw a contrary conclusion. In response to defendant's motion for summary judgment, plaintiff adduced evidence that raised a genuine issue of fact as to when plaintiff knew or should have known of defendant's role in causing the loss that he incurred.

Plaintiff proffered evidence that his purpose in entering into a settlement

14

agreement with the Wheelers was to obtain a release of their crop lien in time to permit him to plant wheat before the February 15 deadline and that he informed Levie of that purpose. Plaintiff was not present when Levie negotiated the settlement agreement with the Wheelers, but when he heard Levie state in open court that the Wheelers had agreed to "execute whatever documents necessary to remove all liens from the Antelope property, with respect to any future * * * farming activities[,]" he believed that the Wheelers had agreed do so immediately. Plaintiff testified that, when the judge accepted the agreement, he believed that the parties were required to comply. Plaintiff also testified that when he asked Levie about the Wheelers' failure to remove the crop lien in the days and weeks following the January 30 agreement, Levie responded that the Wheelers were in breach of the agreement.

Thus, plaintiff proffered evidence from which a jury reasonably could find that, on February 15, 2002, plaintiff did not have actual knowledge that Levie's acts or omissions were a cause of his damages. Plaintiff believed that the Wheelers' timely performance was required and that they had failed to meet their contractual obligations. As to whether plaintiff's belief was objectively reasonable, Levie's advice that the Wheelers were in breach of the agreement is significant. Levie was plaintiff's lawyer. As noted, an assurance made by a person in a relationship of trust and confidence to the plaintiff, such as a lawyer, has a bearing on whether a reasonable person would be aware of a substantial possibility of tortious conduct. The oral settlement agreement, as recited, was silent as to the time for the Wheelers' performance, but Levie assured plaintiff that the Wheelers were nevertheless obligated to perform and that their failure to do so by

15

February 15 was a breach of contract. If the agreement recited in open court had expressly granted the Wheelers the right to wait until after February 15 to remove the crop lien, perhaps we could conclude, as a matter of law, that a reasonable person in plaintiff's position would not have credited Levie's assurance. But given that the agreement, as recited, did not include such a term, the effect of Levie's assurance on a reasonable layperson in plaintiff's circumstances raises a genuine question of fact for a jury.

Important to that conclusion is the fact that, before February 15, 2002, no court had determined and no court has since determined, that the agreement, as recited, did not require the Wheelers' timely performance. A contract that is silent with regard to time of performance must be performed within a reasonable time, and reasonableness is determined by reference to all the facts and circumstances. *Browne & Co. v. John P. Sharkey Co.*, 58 Or 480, 482, 115 P 156 (1911). The contractual duty of good faith and fair dealing prevents a party from performing the contract in such a way as to deprive the other party of the fruits of the contract as long as the term that the other party seeks to impute does not contradict an express term of the agreement. *Uptown Heights Associates v. Seafirst Corp.*, 320 Or 638, 644-45, 891 P2d 639 (1995). Plaintiff's purpose in seeking release of the crop lien was to enable him to plant wheat by February 15. Plaintiff explained that purpose to Levie, and Mr. Wheeler was aware of plaintiff's purpose when he entered into the agreement. Furthermore, the terms of the written agreement between the parties were consistent with that purpose. The written agreement that the parties signed on February 24, but that was effective on January 30, required, "[s]ubject to

16

[plaintiff's] performance[,]" that the Wheelers remove the lien "on request."

Thus, plaintiff had a cognizable legal argument that the agreement required the Wheelers to remove the crop lien within a reasonable time -- by a date that would permit plaintiff to plant wheat by the February 15 deadline -- and that the Wheelers had a duty of good faith and fair dealing that prohibited them from depriving plaintiff of the benefit of his bargain. As of February 15, 2002, no court had rejected those arguments. As Levie advised, plaintiff could have filed an action against the Wheelers for breach of contract. If plaintiff had done so and been successful, he would not have had a malpractice claim against Levie, because plaintiff's success would have indicated that Levie had not been negligent, or, that even if Levie had been negligent, his negligence had not caused plaintiff harm. If plaintiff had filed an action against the Wheelers and been unsuccessful because a court determined that the oral settlement agreement did not require the Wheelers' timely performance, then a court would have determined that Levie had not protected plaintiff's interests and plaintiff's malpractice action against Levie certainly would have accrued, at the very latest, at the time of that determination. *See Davies*, 274 Or at 669-70 (legal malpractice claim accrues as a matter of law on determination of case that results from attorney's advice).

In the absence of such a judicial determination, a jury could find that plaintiff reasonably believed, on February 15, 2002, that the Wheelers were in breach of

17

contract and that the Wheelers, and not his lawyer, were responsible for his damages.[4] Defendant's argument -- that a reasonable person in plaintiff's circumstances should have reached the conclusion that, on February 15, 2002, Levie was at fault -- has merit, and ultimately may be persuasive. However, for the reasons we have explained, we cannot reach that conclusion as a matter of law.

We emphasize that our decision in this case is based on the facts in the record before us. This record does not include evidence that plaintiff acquired information at some time after February 15, 2002, but before he talked with his new counsel in 2007, from which a court could decide, as a matter of law, that plaintiff knew or should have known that there was a substantial possibility that Levie was to blame for his damages. There is no evidence, for instance, of the specific dates on which plaintiff talked to Levie about pursuing a claim against the Wheelers or Levie's explanation for not filing what he portrayed as a "great case." Defendant does not argue that Levie's failure to file a claim against the Wheelers within a reasonable time after he promised to do so or without a credible explanation for declining to act would have led a reasonable person to question Levie's credibility and to suspect his negligence. On this record, we

---

[4]        The fact that plaintiff testified in deposition in 2008 that he believed that, if Levie had asked, the Wheelers would have removed the crop lien, does not compel a contrary conclusion. In 2002, plaintiff reasonably could have trusted Levie and believed that Levie was telling him the truth when he said that it was the Wheelers who refused to act. Years later, after learning from new counsel that Levie may have failed to protect his interests, plaintiff could have realized that the fault lay with Levie, and not with the Wheelers, and testified accordingly.

decide that a genuine question of fact existed as to when plaintiff's claim accrued, and that defendant was not entitled to summary judgment.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.