Kevin D. PADRICK,
Trustee of the Summit Accommodators
Liquidating Trust,
*Plaintiff-Appellant,*

*v.*

Lane LYONS
and Bryant Lovlien & Jarvis, P.C.,
*Defendants,*

*and*

Kevin KEILLOR
and Hurley Re, P.C.,
*Defendants-Respondents.*

Multnomah County Circuit Court
101217611; A153600

372 P3d 528

Robyn Ridler Aoyagi argued the cause for appellant. With her on the briefs were Daniel H. Skerritt, David S. Aman, Caroline Harris Crowne, and Tonkon Torp LLP.

Stephen C. Voorhees argued the cause for respondent Kevin Keillor. With him on the joint answering brief were Graham M. Sweitzer and Kilmer, Voorhees & Laurick, PC, and Peter R. Mersereau, Thomas W. McPherson, and Mersereau & Shannon LLP.

Peter R. Mersereau argued the cause for respondent Hurley Re, PC. With him on the joint answering brief were Thomas W. McPherson and Mersereau & Shannon LLP, and Stephen C. Voorhees, Graham M. Sweitzer, and Kilmer, Voorhees & Laurick, PC.

Before Ortega, Presiding Judge, and DeVore, Judge, and Haselton, Senior Judge.

DEVORE, J.

## DEVORE, J.

Plaintiff Kevin Padrick was appointed by the bankruptcy court as the trustee for the liquidation of Summit Accomodators, Inc., a corporation in Chapter 11 bankruptcy. Plaintiff brought this action against Summit's former attorney, Kevin Keillor, and Keillor's law firm, Hurley Re, P.C. (defendants).[1] Plaintiff sought damages for defendants' alleged tortious conduct while Keillor was representing Summit. Plaintiff appeals from the trial court's entry of judgment for defendants after the court granted defendants' motion for summary judgment on all of plaintiff's claims. We conclude that the trial court did not err and therefore affirm.

Plaintiff brought his claims in two capacities—as Summit's direct successor in interest and as the assignee of claims by Summit's former clients.[2] The trial court ruled against plaintiff on the claims in both capacities. Plaintiff challenges the trial court's ruling that defendants were entitled to summary judgment on plaintiff's "direct" claim for breach of fiduciary duty, which was brought in plaintiff's capacity as successor in interest to Summit. Plaintiff also challenges the court's ruling granting defendants' motion for summary judgment on plaintiff's claim as the assignee of Summit's former exchange clients. In that claim, plaintiff asserts that defendants are jointly liable with Summit's principals on an "aid and abet" theory for the loss of funds entrusted to Summit between May and November 2008.

In reviewing the court's rulings, we view the record on summary judgment in the light most favorable to plaintiff, as the party opposing defendants' motion, for the purpose of determining whether there are genuine issues of

---

[1] The claims were also brought against attorney Lane Lyons and his firm Bryant Lovlien & Jarvis, P.C. Plaintiff settled his claims against Lyons and the Bryant firm, and only Kevin Keillor and Hurley Re, P.C., are respondents on appeal.

[2] Plaintiff as Summit's successor in interest alleged three "direct" claims: legal malpractice, breach of fiduciary duty, and "aiding and abetting" the Summit principals in fraud and breach of fiduciary duty. Plaintiff as the assignee of Summit's clients alleged one claim: that defendants are jointly liable with the Summit principals for having "aided and abetted" the Summit principals' breach of fiduciary duty, conversion, and fraud.

material fact and, if not, whether the trial court correctly concluded that defendants were entitled to judgment as a matter of law. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997).

Summit, an Oregon corporation located in Bend, was in the business of facilitating real property exchanges under Internal Revenue Code section 1031.[3] The corporation was started in 1991 by Mark Neuman and Brian Stevens, certified public accountants who had been practicing in Bend for many years. During most of the time relevant to the issues on appeal, Neuman and Stevens were Summit's principals and sole shareholders.

In its business as a "qualified intermediary" for section 1031 exchanges, Summit received funds from clients who were making real property exchanges that qualify for special tax treatment under section 1031. Summit agreed to hold the clients' funds pending the clients' purchase of "like-kind" exchange properties. Summit's agreement with its exchange clients required that Summit "deposit all cash funds received by it from [clients] into one or more deposit accounts established with one or more financial institutions[.]"

In violation of Summit's agreements with its clients, Summit's principals did not confine clients' deposits to financial institutions; they made unauthorized transfers of funds to Inland Capital Corporation, a "pass-through accounting entity" that the principals created in 1993. Initially, Inland

---

[3] Under 26 USC section 1031 of the Internal Revenue Code, a property owner may defer the capital gains tax on profits from the sale of a business or investment property if the owner purchases a similar property with equal or greater value within 180 days. Money from the sale of the property must be processed through a third party, which is referred to as a "qualified intermediary." During the 180 days, the qualified intermediary keeps the client's money in a bank account or in some other liquid investment that can easily be converted to cash. The qualified intermediary earns revenue by charging the client a fee and by earning interest on the client's money in excess of the interest paid to the client.

Summit held itself out to its clients as a qualified intermediary that would keep clients' money while they concluded their qualifying 1031 transactions. Pursuant to agreements with its clients, Summit could charge fees for its services and could keep as profit a return on clients' funds in excess of the one percent interest paid to clients. During its years of existence, Summit facilitated thousands of exchanges and controlled millions of dollars of client funds at any given time.

existed, at least in part, to facilitate legitimate, more complex, "construction" real estate exchanges. But, beginning in 1993, Summit also began transferring exchange client funds through Inland to finance the Summit principals' private investments. By the time Keillor and his firm began representing Summit in 1995, the practice of using exchange client funds for unauthorized purposes was well-established, and Inland existed primarily for the purpose of diverting exchange client funds to the principals' own personal investments, by lending money to Stevens and Neuman and others.[4] Between 1995 and 2001, the period during which Keillor and members of his firm did legal work for Summit and its principals, Summit's principals diverted over $15 million in exchange client funds to their own investments and ventures.

Beginning in 1995, Keillor provided legal work to Summit, Stevens, and Newman on a project-by-project basis. Keillor did not serve as "general counsel" to Summit. His advice related to specific real estate transactions and transactional documents, as requested by Summit, Stevens, and Neuman. For example, in 1996 and 1999, Keillor reviewed and edited Summit's section 1031 exchange contracts. Consistent with industry practice, Keillor recommended that the contracts include a provision requiring that client funds be deposited with financial institutions; and that provision was, in fact, incorporated into the contracts. Stevens knew about that requirement for the use of exchange client funds and testified that Keillor never advised him that he could disregard it. In November 1998, Summit asked Keillor for advice on whether Summit was required to provide a trust deed to Inland when Inland loaned money in construction exchanges. (He opined that it was not.) For insurance reasons, Summit asked Keillor to advise whether Inland's loan practices made it a "financial institution" subject to federal banking law. (He opined that they did not.) In August 1999, Keillor drafted documents for Summit relating to a transaction known as "Oxford LLC," and drafted documents for

---

[4] The source of Inland's funds was not aways Summit. There is evidence in the record that Stevens and Neuman twice deposited their own funds in Inland, to be invested at a higher interest rate than could otherwise be earned through conventional investment.

Stevens and Neuman in an investment known as "Doctor's Court."

Keillor logged relatively few hours of work for Summit over the years. The bulk of Keillor's work for Summit occurred in 1996 and 1997, when he billed about 55 hours per year. In the last years, from 1998 to 2001, Keillor billed an average of 10 hours per year to Summit. Keillor left the private practice of law and ceased doing work for Summit in April 2001.

After that, Summit took its legal work to Lane Lyons, who later became in-house counsel to Summit in 2005 and a principal and shareholder in 2006. After Keillor's departure, Summit's exchange business increased dramatically, as did the principals' unauthorized use of client funds. Between 2001 and 2005, Summit's transfers to Inland grew from $6.5 million to $28.5 million. By the time Lyons became Summit's in-house counsel in 2005, over 40 percent of Summit's exchange client funds were being diverted to Inland for investment by Summit's principals. By 2006, more than 80 percent of Summit's exchange client funds were being funneled to Inland.

Sometime earlier, in the mid-1990s, and before Keillor's involvement, Summit had experienced a liquidity problem, resulting from the unauthorized use of exchange client funds, causing Stevens and Neuman to personally cover losses of $500,000. In 2006, Lyons became concerned that the practice of investing exchange client funds in the Summit principals' personal ventures would interfere with Summit's ability to meet its obligations to its exchange clients. He worried that the practice constituted a violation of the exchange agreements, a misrepresentation to Summit's clients, and a breach of fiduciary duty to Summit's "partners."[5] He expressed those concerns in a strongly worded memorandum to Summit's principals on October 17, 2006:

> "In substance, the use of exchange funds by Inland constitutes both a misrepresentation to our clients under their exchange agreements, as well as a breach of our fiduciary

---

[5] Lyons' mention of Summit's "partners" appears to be a reference to Summit's affiliates in other cities.

duty to our partners. In essence, any kind of 'run on the bank' where our exchangers needed their funds to close deals in succession would result in Summit being unable to fulfill its obligations. * * *

"The point of this is quite simple, in the event of any run on the bank by exchangers or any kind of a dispute with one of our branch partners, if the Inland issue comes to light (and it would) I can assure you that each principal of Summit (Bend) and Inland will be personally named in the suit, and fraud charges will be leveled at each such principal."

The principals met the next day, October 18, 2006, and discussed the issues in the memorandum. The minutes of that meeting record that Lyons "went postal" on the topic of Inland and "said it's a common law fraud issue and a fiduciary duty issue regarding our partners." Despite Lyons' alarm, Summit's principals, however, continued to divert exchange client funds to their personal investments.

Lyons' prediction came true. In December 2008, after the downturn in the real estate market, Summit began to experience liquidity problems and was unable to meet its obligations to its clients. It sought assistance from a bankruptcy attorney, Susan Ford, who advised Summit that the Inland scheme was financially improvident and potentially criminal. Ford advised Summit to stop taking new clients, which it did. In December 2008, Summit filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code. Exchange clients who had entrusted funds with Summit between May and November 2008 lost their money.[6]

After the court approved Summit's liquidation plan, Summit's assets were transferred to a liquidating trust, and the bankruptcy court appointed plaintiff, who had been Summit's Chapter 11 trustee, as trustee for the liquidation of Summit's assets. In that role, plaintiff is authorized to bring claims as Summit's successor in interest against

---

[6] Summit's principals were charged in federal district court with conspiracy to commit wire fraud and money laundering, based on conduct from 1999 to 2008. Stevens pleaded guilty in 2011, and Neuman and Lyons were convicted by a jury in July 2013.

those who might owe damages to Summit or to Summit's creditors, and plaintiff is also the assignee of Summit's clients who lost their money because of the diversion of funds through Inland between May and November 2008.

In 2010, plaintiff brought this action against defendants, seeking damages as Summit's successor in interest and as the assignee of claims by Summit's 2008 clients. Among other claims, plaintiff alleged in his capacity as Summit's successor in interest that defendants breached their fiduciary duty to Summit by providing representation and advice to Summit's principals and to other entities whose interests were adverse to Summit's interests.[7] Plaintiff also alleged that Keillor breached a fiduciary duty to Summit by taking out a personal loan from Inland in 2000 while representing Summit.[8]

In his capacity as the assignee of the claims of Summit's 2008 clients, plaintiff alleged a claim asserting defendants' joint liability with the Summit principals. He alleged that defendants "aided and abetted" the principals by acting in concert with the principals pursuant to a common plan or design and by "substantially assisting" the principals and encouraging their tortious conduct. Plaintiff alleged that defendants are jointly liable with Summit's

---

[7] Plaintiff alleged at paragraph 19 of the third amended complaint:

"During the same time period that they were acting as Summit's primary outside legal counsel, [defendants] also represented and advised one or more of the Principals and Inland. This advice included matters that were adverse to Summit's interest because the matters involved the diversion of Exchange Funds to and/or through Inland. [Defendants] knew that the Principals funded Inland with Exchange Funds. They knew these funds were diverted from Summit in violation of Summit's exchange agreements. [Defendants] also knew that Inland's principal business activity was lending funds to the Principals and to related persons and entities for their personal benefits. Therefore, [defendants] were on notice that Inland's interests were fundamentally adverse to Summit's interests. Despite this fundamental conflict of interest, [defendants] provided advice to Inland ***[.] *** In addition to their advice to Inland, [defendants] advised the Principals sometime in or after 1999 regarding their ownership interests in business entities funded with Exchange Funds diverted from Summit, including Inland and three other entities[.]"

[8] On summary judgment, Keillor rejoins that the transaction actually occurred after he ceased representing Summit or its principals and that he actually paid money *to* Inland in the course of buying a two percent interest in a business venture.

principals for "providing legal advice to the Principals and Inland to facilitate their diversion of Exchange Funds to and through Inland" and "actively encouraging the Principals and their related entities to continue to engage in tortious conduct."

Both of plaintiff's claims depend in part on an inference that plaintiff asserts may be drawn from evidence in the record on summary judgment that Keillor knew that the Summit principals were using client funds for their personal investments. Thus, a major dispute in this case is how much, if anything, Keillor knew about the Summit principals' diversion of client exchange funds to their personal investments. Plaintiff contends that the necessary result of Keillor's legal work for Summit and its principals is that Keillor had to have known the principals were misusing exchange client funds for nonexchange purposes. Plaintiff believes that, because Keillor advised about legal documents, he had to have known about the money flow.

Keillor acknowledges that he was aware of the existence of Inland, that it was owned by Stevens and Neuman, that funds were transferred from Summit to Inland, and that Inland loaned money to Stevens and Neuman. Keillor contends that his legal work for Summit and its principals, consisting primarily of drafting project-specific transactional documents, did not require that he know the sources of Inland's funds. He attested that, to the extent exchange client funds were transferred to Inland, the transfers were for legitimate exchange purposes, including "construction" exchanges. Keillor denies that he knew that the Inland funds transferred from Summit were used for nonexchange purposes or that Inland loaned exchange client money to Stevens and Neuman.

The trial court resolved the claims on defendants' motion for summary judgment. The trial court acknowledged that the question about what Keillor knew was a close one but agreed with plaintiff that there was evidence, "definitely of the circumstantial nature and very tenuous," from which an inference could be drawn that Keillor was aware that client funds were being used for nonexchange purposes. The trial court concluded that that factual question precluded

summary judgment for defendants on that ground. The court recognized that there was evidence from which a reasonable jury could find that Keillor knew that Summit's principals were diverting exchange client funds through Inland to be used by Summit's principals for nonexchange purposes.[9]

Nonetheless, the court granted summary judgment to defendants on plaintiff's direct claim for breach of fiduciary duty on several other grounds. The court ruled that plaintiff's direct claim was barred by the statute of limitations, determining that Summit and its principals had learned, no later than October 18, 2006, that the failure of Keillor to advise against the use of client funds had caused Summit's harm. Additionally, the trial court ruled that plaintiff's direct claim for breach of fiduciary duty was barred by the doctrine of *in pari dilecto*, because Summit, through its principals, was equally or more at fault than defendants for Summit's losses. *See McKinley v. Weidner*, 73 Or App 396, 401, 698 P2d 983 (1985) (describing doctrine). The court ruled, further, that the record on summary judgment did not permit a finding that Summit's damages on the direct claim were caused by any breach of duty by defendants, in light of the undisputed evidence that Summit's principals had engaged in their unauthorized activities before and after Keillor worked for Summit and knew that their activities were wrongful and financially risky.

The trial court also granted defendants' motion for summary judgment on plaintiff's claim as the assignee of Summit's 2008 exchange clients. The court concluded that, despite the existence of a factual question as to whether Keillor knew of the improper use of exchange client funds, the record on summary judgment did not include evidence that Keillor was involved in a way that would give rise to joint liability on an "aid and abet" theory under Oregon law. Alternatively, the court concluded that any alleged misconduct by Keillor could not provide a basis for defendants' joint liability as a matter of law, because the record on summary judgment shows that defendants' acts occurred within the scope of a lawyer-client relationship, which, under *Reynolds v. Schrock*, 341 Or 338, 142 P3d 1062 (2006), is subject to immunity.

---

[9] Defendants dispute that ruling but do not cross-assign it as error.

On appeal, plaintiff challenges the trial court's rulings. We address first plaintiff's contention that the trial court erred in granting defendants' motion for summary judgment on plaintiff's direct claim for breach of fiduciary duty, based on the court's conclusion that the claim is barred by the statute of limitations. It is undisputed that, as the liquidation trustee, plaintiff is Summit's successor in interest. In that role, plaintiff steps into Summit's shoes for purposes of any affirmative defenses that might be raised by defendants, including the statute of limitations. *See Geroy v. Upper and Knight v. Barry*, 182 Or 535, 546, 187 P2d 662 (1948) (a receiver stands in the shoes of the corporation or person whose property is in receivership with exactly the same rights and obligation); *see also Ahom, Ltd. v. Smeding*, 623 F3d 1248, 1250 (9th Cir 2010) (bankruptcy trustee stands in shoes of the bankrupt party in asserting claims owned by debtor). It is also undisputed that the two-year limitation period set forth in ORS 12.110(1) applies to plaintiff's breach of fiduciary duty claim, as does the rule of discovery described in that statute.[10] Under the discovery rule, the statutory period begins to run from the earlier of (1) the date the plaintiff actually discovers the injury or (2) the date when the plaintiff, exercising reasonable care, should have discovered the injury, including learning facts that an inquiry would have disclosed. *Greene v. Legacy Emanuel Hospital*, 335 Or 115, 123, 60 P3d 535 (2002). Thus, the relevant question for purposes of the statute of limitations is when Summit's principals knew or reasonably should have known of any lapse, failure, or breach of fiduciary duty by Keillor.[11]

A plaintiff discovers an "injury" when the plaintiff knows or should have known the existence of three elements:

---

[10] ORS 12.110(1) provides, in part:

"An action * * * for any injury to the person or rights of another, not arising on contract, and not especially enumerated in this chapter, shall be commenced within two years; provided, that in an action at law based upon fraud or deceit, the limitation shall be deemed to commence only from the discovery of the fraud or deceit."

[11] Plaintiff's claim for breach of fiduciary duty began by realleging the prior allegations that Keillor knew of the diversion of Summit funds through Inland and had a conflict in advising Summit, Inland, and the principals. The same facts, which were part of the claim for professional negligence, were likewise incorporated by reference.

(1) harm; (2) causation; and (3) tortious conduct. *Gaston v. Parsons*, 318 Or 247, 255, 864 P2d 1319 (1994) (so stating with regard to ORS 12.110(4)). "[T]he facts that a plaintiff must have discovered or be deemed to have discovered include not only the conduct of the defendant, but also, under *Gaston*, the tortious nature of that conduct." *Doe v. Lake Oswego School District*, 353 Or 321, 331, 297 P3d 1287 (2013).

For purposes of determining what facts a plaintiff knows or should have known, "[t]he discovery rule applies an objective standard—how a reasonable person of ordinary prudence would have acted in the same or a similar situation." *Kaseberg v. Davis Wright Tremaine, LLP*, 351 Or 270, 278, 265 P3d 777 (2011). A plaintiff has a duty to act diligently to discover the relevant facts. *Branch v. Hensgen*, 90 Or App 528, 531, 752 P2d 1275, *rev den*, 306 Or 527 (1988). The nature of the plaintiff's relationship with the defendant is relevant to the question whether the plaintiff has acted with sufficient diligence. *Hoeck v. Schwabe, Williamson & Wyatt*, 149 Or App 607, 612, 645 P2d 534 (1997). Whether a plaintiff has discovered an injury generally presents a factual question for the jury, but the question is susceptible to judgment as a matter of law if "the only conclusion a reasonable jury could reach is that the plaintiff knew or should have known the critical facts at a specified time and did not file suit within the requisite time thereafter." *T. R. v. Boy Scouts of America*, 344 Or 282, 296, 181 P3d 758 (2008). For purposes of this case, the "harm" to plaintiff necessary to give rise to "discovery" occurred when Summit knew of or should have known facts that would make a reasonable person aware of the substantial possibility that Summit had suffered financial loss as a result of defendants' tortious conduct. *See Kelly v. Lessner*, 224 Or App 31, 36, 197 P3d 52 (2008) (describing harm necessary to give rise to discovery in context of claim for financial loss based on breach of fiduciary duty).

Although plaintiff filed this action in December 2010, the pertinent date to consider for the purpose of determining whether plaintiff brought the breach of fiduciary duty claim within the statutory period is December 19, 2008, the date when Summit filed its petition in bankruptcy.

That is because, under federal law, 11 USC section 108(a), if the limitation period has not expired before the filing of the petition in bankruptcy, it is suspended by the filing of a bankruptcy petition.[12] In that event, under section 108(a), the plaintiff debtor may commence an action by the later of the end of the limitation period or two years after the order for bankruptcy relief. Plaintiff's action, commenced in December 2010, was within the time period permitted by section 108(a) if the limitation period had not already expired when Summit filed its petition in bankruptcy on December 19, 2008.

It would ordinarily be a question of fact precisely when Summit's principals knew or reasonably should have known facts that would make them aware of a substantial possibility that Summit had suffered harm as a result of Keillor's alleged breach of fiduciary duty, unless the facts are such that no triable issue exists and the matter may be resolved as a matter of law. See T. R., 344 Or at 296; Kelly, 224 Or App at 36; Cairns v. Dole, 195 Or App 742, 745, 99 P3d 781 (2004). Here, the trial court concluded that defendants were entitled to judgment as a matter of law based on the statute of limitations, because Summit's principals knew or reasonably should have known no later than October 18, 2006, based on Lyons' memorandum, that defendants' failure to advise them not to engage in self-dealing with exchange client funds had caused Summit's damages.

In reviewing the trial court's ruling, we must ask, does the record give rise to a triable issue of fact as to whether, more than two years before Summit filed its petition in bankruptcy, Summit's principals knew, or in the exercise of reasonable care, should have known facts that would have made a reasonable person aware of a substantial possibility that defendants had breached a fiduciary duty

---

[12] 11 USC section 108(a) provides:

"If applicable nonbankruptcy law *** fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of—

"(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

"(2) two years after the order for relief."

to Summit and that that breach had resulted in financial loss to Summit? *See Gaston*, 318 Or at 256. If there is a triable issue of fact on the question, we must reverse the trial court's ruling granting summary judgment to defendants on plaintiff's direct claim for breach of fiduciary duty based on the statute of limitations.

The trial court relied on Lyons' memorandum of October 17, 2006, to conclude that plaintiff had notice of a substantial possibility that Keillor had breached a duty of care to Summit and that Summit had been harmed as a result. The memorandum warned that the practice of using exchange client funds for personal investments presented significant financial and legal risks to Summit and its principals. Defendants underscore the evidence in the record that, even before Summit retained defendants in 1995, Summit's principals were aware that their scheme of diverting exchange client funds to Inland for their own personal investments was wrong and financially risky for Summit.

In support of his contention that the record nevertheless presents a question of fact as to what Summit knew, plaintiff contends that, despite the memorandum's general warnings and the principals' general knowledge of the wrongfulness and risks of their conduct, the memorandum made no reference to the primary factual basis for plaintiff's breach of fiduciary duty claim—Keillor's representation of Summit's principals on personal matters that conflicted with Summit's interests because they involved the use of exchange client funds. Plaintiff argues that the memorandum did not specifically connect Summit's problems to that conduct. Thus, in plaintiff's view, the memorandum cannot provide the relevant basis for the discovery of defendants' alleged breach of fiduciary duty through a conflict of interest or that that breach was the cause of Summit's loss.

Defendants correctly respond that to trigger the running of the statute of limitations, it is not necessary that a plaintiff be aware of every potential breach of duty. A claim accrues when the plaintiff knew or reasonably should have known of "legally cognizable harm." *Gaston*, 318 Or at 255 n 8 ("Although 'tortious conduct' is an element of injury under the discovery rule, a plaintiff does not need to identify

a particular theory of recovery before the statute of limitations begins to run. All that is required is that the plaintiff discover that some invasion of the legally protected interest at stake has occurred.").

Although plaintiff contends that Lyons' memorandum did not explicitly mention Keillor's role in the financial and legal crisis presented in 2006, it nonetheless provided Summit's principals the information from which Summit reasonably should have known that defendants' alleged advice, facilitating the conflicting interests, had helped create the crisis. Summit's principals reasonably should have known, at least by the time of Lyons' memorandum, that their use of exchange client funds for their private investments was a breach of their agreements with their clients. They were aware by that time that their personal use of exchange client funds posed a risk of loss to Summit and put Summit in a financially impaired position. From that knowledge, Summit's principals who, as CPAs, were subject to their own standards of professional conduct, *see* ORS 673.445; OAR 801-030-0010; OAR 801-040-0010, reasonably should have known that, to the extent Keillor represented them on or failed to advise them not to engage in those activities, Keillor had acted in conflict with Summit's interests.[13] That is knowledge of "legally cognizable harm," as described by *Gaston*, for purposes of a breach of fiduciary duty claim. It is sufficient to trigger the running of the statute of limitations.

We conclude, as a matter of law, that Summit's principals knew or reasonably should have known, more than two years before the filing of the bankruptcy petition, and at least by October 18, 2006, of a substantial possibility that harm suffered by Summit had been caused by defendants' alleged representation of Summit's principals on matters that conflicted with Summit's interests. Thus, we conclude that the trial court correctly granted defendants' motion for

---

[13] As noted, the memorandum warned that Summit's principals' practice of transferring client funds to Inland and investing those funds could lead to the financial downfall of Summit, stating that, "[i]n the event of a run on the bank by the exchangers * * * if the Inland issue comes to light * * * I can assure you that each principal of Summit * * * and Inland will be personally named in a suit, and fraud charges will be leveled at each such principal."

summary judgment on plaintiff's direct claim for breach of fiduciary duty based on the statute of limitations.

As noted, the trial court relied on two additional grounds for summary judgment against plaintiff's direct claim of breach of fiduciary duty. In light of our conclusion that the fiduciary duty claim is barred by the statute of limitations, we need not reach those issues.

We next address plaintiff's contention that the trial court erred in granting defendants' motion for summary judgment on plaintiff's claim, as the assignee of the exchange clients who placed their money with Summit between May and November 2008, that defendants "aided and abetted" the wrongdoing of Summit principals, such that defendants are jointly liable for the principals' wrongdoing. The theory of joint liability is premised on the *Restatement (Second) of Torts* (1979), section 876, which the Supreme Court indicated in *Granewich v. Harding*, 329 Or 47, 53, 985 P2d 788 (1999), "reflect[s] the common law of Oregon" with respect to the circumstances in which a person who assists another in committing a tort may be liable to the third party.

As summarized in section 876, a person is subject to liability for harm to a third person from the tortious conduct of another if the person:

"(a)  does a tortious act in concert with the other or pursuant to a common design with him, or

"(b)  knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

"(c)  gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person."

Here, plaintiff focuses on subsections 876(a) and (b) and asserts that there is evidence from which the trier of fact could find that defendants either acted in concert with or "substantially assisted" the Summit principals in their wrongdoing that caused loss to Summit's clients who deposited their funds with Summit between May and November 2008. The trial court concluded that plaintiff's claim asserting aid-and-abet liability fails because the record on

summary judgment does not include evidence that Keillor either acted in concert with Summit's principals or gave them "substantial assistance."

We readily agree that the record contains no evidence to support a finding that defendants acted "in concert." As we held in *Slagle v. Hubbard*, 176 Or App 1, 5, 29 P3d 1195 (2001), *adh'd to on recons*, 178 Or App 632, 37 P3d 256, *rev den*, 334 Or 260 (2002), a person commits a tortious act "in concert" with another person when the person performs an action that is "mutually contrived or planned," "agreed on," "performed in unison," or "done together." *Id.* at 5 (citing *Webster's Third New Int'l Dictionary*, 470 (unabridged ed 1993) (defining "concerted"). There is no evidence in this record that would support a finding of conduct of that nature.

We further agree with the trial court's conclusion that the record on summary judgment does not support liability based on the theory that defendants provided "substantial assistance." The cases that have addressed "aider and abettor" liability based on a theory of "substantial assistance" have required active complicity, with an actual awareness of the party's role in furtherance of the tortious objective. In *Granewich*, 329 Or at 54, the court cited a discussion from its opinion in *Perkins v. McCullough*, 36 Or 146, 149, 59 P 182 (1899), as an example of Oregon's common law application of the concepts later adopted in *Restatement (Second) of Torts* subsection 876(b):

> "'[A]ll who aid, command, advise, or countenance the commission of a tort by another, or who approve of it after it is done, if done for their benefit, are liable in the same manner as they would be if they had done the same tort with their own hands.'"

Thus, the substantial assistance must be directed to the commission of the tort itself. In *Reynolds v. Schrock*, 197 Or App 564, 576, 107 P3d 52 (2005), *rev'd on other grounds*, 341 Or 338, 142 P3d 1062 (2006), we said that an attorney may be jointly liable with the client under subsection 876(b) when the attorney provides substantial assistance or encouragement by affirmative conduct that "actually" furthers the client's tort, "done by the attorney with knowledge that he

or she is furthering the breach."[14] Thus, the third party's "substantial assistance" must represent the person's active participation in the furtherance of the tortious objective.

There are also foreseeability and causation components to "substantial assistance." The comment to *Restatement* subsection 876(b) states that the third person may be liable based on substantial assistance or encouragement if

"[t]he encouragement or assistance is a substantial factor in causing the resulting tort ***[.]

"The assistance of or participation by the defendant may be so slight that he is not liable for the act of the other. In determining this, the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind are all considered. *** Likewise, although a person who encourages another to commit a tortious act may be responsible for other acts by the other ***, ordinarily he is not liable for other acts that, although done in connection with the intended tortious act, were not foreseeable to him. *** In determining liability, the factors are the same as those used in determining the existence of legal causation when there has been negligence or recklessness."

(Footnotes omitted.)

Plaintiff's theory is that the advice that Keillor gave to Summit and its principals between 1995 and 2001 permitted and encouraged them to continue their unauthorized practice of using exchange client funds. Plaintiff contends that that practice, allegedly known to Keillor, continued and expanded over the next seven years after Keillor had ceased doing legal work for Summit, so as to cause the loss to the

---

[14] Comment d to section 876(b) provides, in part:

"Advice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance. If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act. This is true both when the act done is an intended trespass and when it is merely a negligent act. The rule applies whether or not the other knows his act is tortious. It likewise applies to a person who knowingly gives substantial aid to another who, as he knows, intends to do a tortious act."

exchange clients who deposited funds with Summit from May to November 2008.

We conclude that the inference that plaintiff seeks— that Keillor's legal advice from 1995 to 2001 encouraged the Summit principals to continue and magnify their wrongdoing fully seven years later—is simply too speculative and remote. *Parker v. Pettit*, 171 Or 481, 490, 138 P2d 592 (1943) ("No recovery can be had where resort must be had to speculation or conjecture for the purpose of determining whether the damages resulted from the act of which complaint is made or from some other cause."); *see also Chapman v. Mayfield*, 263 Or App 528, 535-36, 329 P3d 12 (2014) (evidence is insufficient when the stacking of inferences becomes speculative) *aff'd,* 358 Or 196, 361 P3d 566 (2015) (affirmed on other grounds). And, even if it were not speculative, we agree with the trial court that the record on summary judgment simply does not support the critical determination that defendants provided the requisite "substantial assistance" to the bad actors in 2008.

We recognize that there is circumstantial evidence in the record on summary judgment from which the trier of fact could find that Keillor knew, at the time he did work for Summit, that Summit's principals were then diverting client exchange funds to nonexchange purposes. However, it is undisputed that Keillor was not engaged in advising Summit or its principals in 2008, nor was he engaged in transactions involving the exchange clients' investments made between May and November 2008. Keillor was long gone, having left private practice in 2001. It is undisputed that the exchange agreement from Keillor's days was an agreement that required Summit to deposit funds in a "financial institution," which Keillor had told the principals that Inland was not.

After Keillor's departure, the successor attorney Lyons had sounded the alarm in 2006, disabusing the principals of any imagined misconception that diversion of the funds might be permissible. While nothing in the record reflects why the principals disregarded Lyons' alarm and continued their practices for two more years, nothing in the record indicates that Keillor played any role in the

principals' decision to continue their practices beyond 2006 and into 2008.

In 2008, seven years after Keillor's departure, Summit and its principals acted without Keillor's involvement. As a result, there is no evidence from which it could be found that Keillor acted in furtherance of a tortious objective, such that his conduct could constitute "substantial assistance" as to the wrongs committed by Summit or its principals in 2008. Therefore, we conclude that the trial court correctly granted defendants' motion for summary judgment on the "aid and abet" claim.[15]

Affirmed.

---

[15] An additional rationale for granting defendants' motion for summary judgment on the aid and abet claim was the trial court's conclusion that Keillor's alleged misconduct that formed the basis for the claim occurred within the scope of a lawyer-client relationship, which, under *Reynolds v. Schrock*, 341 Or 338, 142 P3d 1062 (2006), may be conduct subject to immunity. In light of our conclusion affirming the trial court's granting of summary judgment to defendants on the ground that Keillor did not provide "substantial assistance," we do not address the trial court's conclusion that Keillor's conduct would have been immune under *Reynolds*.