JAMES, P. J.
*499 Plaintiff, a corporation, filed suit on February 24, 2015, against its former attorney, defendant, for professional negligence in advising the company concerning a distribution contract. The trial court found for defendant on summary judgment, concluding that plaintiff's claim was barred by the statute of limitations, because the company knew of the existence of all elements of the claim-including the existence of harm measurable in damages-more than two years prior to the filing of the malpractice suit. We reverse and remand.
We state the facts adduced by the parties on summary judgment in the light most favorable to the nonmoving party, in this case, plaintiff. Outdoor Media Dimensions Inc. v. State of Oregon , 331 Or. 634, 638, 20 P.3d 180 (2001) ; Hampton Tree Farms, Inc. v. Jewett , 320 Or. 599, 613, 892 P.2d 683 (1995). In early 2012, Northwest Cups, a company that would later become Pact Trading Group (Pact), approached plaintiff, Merchants Paper Co., about entering an exclusive distribution deal for Oregon for its paper cup products. Pact had been plaintiff's competitor in the wholesale paper cup business. Under the proposed deal, Pact would withdraw from direct customer sales and instead serve as an intermediary between plaintiff's and Pact's paper cup suppliers in Asia.
Plaintiff requested defendant review the distribution contracts, and defendant responded with comments and some proposed drafting changes. However, at the time of negotiations, defendant did not call to plaintiff's attention that the agreements included a unilateral opt-out clause, which gave Pact the right to terminate the contract without cause on 30 days' notice, but provided no corresponding right for plaintiff to terminate the deal in a similar manner.
Later in the negotiations, Pact and plaintiff sought to expand the proposed deal beyond Oregon to include paper cup sales in Washington. A second, proposed contract was drafted-this one for Washington-and defendant reviewed that contract as well. The Washington contract contained all the terms of the Oregon contract, including the unilateral *500 opt-out provision. It also contained the same minimum purchase requirements; thus, signing the two agreements would commit plaintiff to two mandatory minimum purchase orders instead of one.
On March 1, 2012, once the final agreements had been drafted, plaintiff forwarded them to defendant for defendant to review and give plaintiff his "okay." On March 3, *813 2012, defendant informed plaintiff that the agreements "look OK to me."
The agreements became effective April 1, 2012. Very quickly after Pact and plaintiff entered into the agreements, issues began to arise, such as Pact's former customers' unwillingness to buy from plaintiff and problems around lead times and shipping. In June of 2012, plaintiff ordered over $64,000 of product from Pact, pursuant to its purchase obligations under the contract. Plaintiff made no further purchases after June. On January 23, 2013, Pact contacted plaintiff asking it to place its contractually obligated order. However, plaintiff had substantial inventory that remained unsold. Plaintiff emailed Pact saying that its inventory was too high to consider another order from Pact at that time and ended the email with "* * * I think we are going to terminate our agreement." Pact responded that termination was not possible.
On January 25, 2013, plaintiff emailed defendant informing defendant that plaintiff had tried to terminate the distribution agreements and commented that plaintiff had noticed that "* * * we neglected to say we also have the right to terminate." Plaintiff also told defendant that Pact was unwilling to allow plaintiff to walk away from the agreements, but that plaintiff did not see "anything that shows what relief if any they can get if we do not live up to our agreement and are found in breach of contract...it does not spell out any penalties. Let me know what you think." (Ellipsis in original.)
Plaintiff and defendant met on February 4, 2013. At that meeting, defendant advised that he would respond to Pact that the contracts were legally unsound and, therefore, unenforceable. According to plaintiff, at that meeting *501 defendant advised that unilateral termination clauses were not permitted in Oregon and the inclusion of one rendered a contract unenforceable. Further, defendant advised plaintiff that the contracts were "non-standard distribution contracts" and that, as such, plaintiff would be excused from further performance under them.
After showing a draft letter to plaintiff on or about February 13, 2013, defendant sent a finalized version of that letter to Pact on February 25, 2013, detailing the ways in which the distribution agreements were unsatisfactory to plaintiff and describing the issues as "unanticipated problems." Defendant's letter to Pact characterized the agreements as "legally unsound, as it is a non-standard distribution contract, and it provides for termination only by one party, among other defects." Defendant's letter also stated that "a number of initial assumptions that would have made this contract sustainable have been frustrated, and [plaintiff] is confident that the legal ground for cancelling the contract is sound."
On March 26, 2013, Pact's attorneys returned a letter to defendant stating, among other things, that there had been no frustration of purpose for either party and the agreements were legal and enforceable. The letter demanded reassurance in the form of a 50 percent down payment for the required orders plaintiff had yet to place and stated that, if the demand was not met, Pact would seek all available remedies, including filing suit.
Pact subsequently brought suit against plaintiff on April 1, 2013. Defendant then referred plaintiff to a different attorney to handle the breach of contract litigation and defendant provided plaintiff's new attorneys with documents on or about April 9, 2013. On April 15, 2013, plaintiff's new attorneys began considering options for plaintiff in defending against Pact, as well as considering a malpractice claim against defendant. Plaintiff paid a retainer to the new law firm on or about April 19, 2013.
In the breach of contract suit, plaintiff and Pact both filed motions for summary judgment. The summary judgment court ruled in Pact's favor, concluding that both *502 agreements were valid and enforceable and that plaintiff had breached the agreements. In the wake of that 2014 summary judgment ruling, plaintiff settled the case by agreeing to pay Pact $135,000.
Plaintiff initiated this suit for legal malpractice on February 24, 2015. Plaintiff alleged defendant was professionally negligent in several particulars, including "in failing to advise plaintiff that Pact's original and revised proposals should have provided for termination not just for Pact, but for plaintiff * * *" and "in failing to advise plaintiff that *814 Pact's original and revised proposals contained other defects * * *." Plaintiff sought $250,000 in damages-$135,000 for settling the breach of contract suit with Pact and $115,000 for legal fees incurred in defending that breach of contract action.
Defendant moved for summary judgment on the basis that plaintiff's suit against defendant was barred by the statute of limitations. According to defendant, plaintiff knew of all the elements of the claim more than two years prior to bringing suit. As the arguments developed in the trial court, there was little dispute that plaintiff knew of defendant's breach of duty prior to February 24, 2015. The point of contention became when plaintiff knew, or reasonably should have known, that defendant's conduct resulted in harm to plaintiff measurable as damages.
According to plaintiff, because its complaint only sought compensation related to what it incurred as a result of terminating the contract, the operative time when it knew defendant's conduct actually harmed it in a measurable way was when Pact sued and plaintiff retained new counsel-in April 2013. Plaintiff noted that the malpractice suit did not seek lost profits because the merchandise did, in fact, sell at a profit and, although the distribution agreement became undesirable, the agreement never became unprofitable.
Defendant, however, argued that profit was not the correct measure of harm. According to defendant, being contractually obligated in any undesirable manner as a result of negligent conduct, even if the contract was profitable, constituted compensable harm and that, therefore, plaintiff knew *503 of all the elements of the malpractice claim by January of 2013. The trial court agreed with defendant and granted summary judgment and plaintiff appealed.
On appeal, plaintiff assigns error to the trial court's grant of summary judgment in defendant's favor. All parties agree that the critical issue is when plaintiff knew of the elements of the claim of malpractice; in particular, when plaintiff knew it was harmed by defendant's conduct. The critical time, therefore, is February of 2013-two years prior to the date of the suit. In arguing that plaintiff knew of harm prior to that date, defendant advances what we construe to be three theories. First, defendant argues that plaintiff knew it was harmed when it knew it was bound to a contract that differed, in any form or degree, from what it originally intended. Under that theory, plaintiff would have known of the element of harm on January 23, 2013, when it noticed the unilateral opt-out clause. Defendant's second theory is that plaintiff was harmed when the contract became undesirable from a business perspective. Under that theory, plaintiff would have known of the element of harm sometime between April 2012 and January 2013. Finally, defendant's third theory is that plaintiff was harmed when it voluntarily breached the contract with Pact. Under that theory, plaintiff knew of the element of harm on January 25, 2013.
Because this is an appeal from a ruling on a motion for summary judgment, we view the evidence in the record, and all reasonable inferences to be drawn from the record, in the light most favorable to the nonmoving party in order to determine whether there were any genuine issues of material fact and, if not, whether defendant was entitled to judgment as a matter of law. Cannon v. Dept. of Justice , 288 Or. App. 793, 796, 407 P.3d 883 (2017), rev. den. , 362 Or. 860, 418 P.3d 16 (2018).
An action for legal malpractice is not significantly distinct from an ordinary negligence action. "It is simply a variety of negligence in which a special relationship gives rise to a particular duty that goes beyond the ordinary duty to avoid a foreseeable risk of harm." Watson v. Meltzer , 247 Or. App. 558, 565, 270 P.3d 289 (2011), rev. den. , 352 Or. 266, 286 P.3d 1231 (2012). As such, a claim for legal malpractice carries with it the elements of (1) duty, (2) breach, (3) harm measurable in damages, and (4) a causal connection between the breach of duty and the harm. Id.
ORS 12.110(1) sets forth the statute of limitations for a legal malpractice action. It provides:
"An action for assault, battery, false imprisonment, or for any injury to the person or rights of another, not arising on contract, and not especially enumerated in this *815 chapter, shall be commenced within two years[.]"
In determining when a legal malpractice claim arises, we employ the discovery rule. U.S. Nat'l Bank v. Davies , 274 Or. 663, 666, 548 P.2d 966 (1976) ( Davies ). "The discovery rule applies an objective standard-how a reasonable person of ordinary prudence would have acted in the same or a similar situation." Doughton v. Morrow , 255 Or. App. 422, 429, 298 P.3d 578, rev. den. , 353 Or. 787, 304 P.3d 466 (2013). Under the discovery rule, a legal malpractice claim accrues when a person knows or, in the exercise of reasonable care, should know, that there is a substantial possibility that the person has an actionable injury. Kaseberg v. Davis Wright Tremaine, LLP , 351 Or. 270, 278, 265 P.3d 777 (2011) ; Guirma v. O'Brien , 259 Or. App. 778, 779, 316 P.3d 318 (2013). Thus, a legal malpractice claim arises when the person "knows or, in the exercise of reasonable care, should know that there is a substantial possibility that (1) he or she has suffered harm, (2) the harm was caused by the lawyer's acts or omissions and, (3) the lawyer's acts or omissions were tortious." Guirma , 259 Or. App. at 779-80, 316 P.3d 318.
First, relying on Jaquith v. Ferris , 297 Or. 783, 687 P.2d 1083 (1984), defendant argues that plaintiff knew, or reasonably should have known, it was harmed by defendant's conduct from the moment plaintiff realized it was bound by a contract that was deficient-or not precisely what plaintiff thought it had agreed to-in any respect . As defendant argues, "[O]nce plaintiff's representatives believed that defendant's transactional advice was erroneous in at least some respect and that its legal interests had been impaired by the Pact contracts, the harm element of the claim against *505 defendant was discovered for statute of limitations purposes." Defendant's reading of Jaquith sweeps too far.
In Jaquith , the plaintiff engaged the defendant, a realtor, to appraise and market a parcel of real property in December 1977. The appraisal was for $164,325. In January 1978, the plaintiff and a potential buyer signed an earnest money agreement to convey the property at the appraised price. In May 1978, the plaintiff discovered that the true market value of the property was $400,000 and refused to proceed with the sale. The buyers sued for specific performance and were ultimately successful in that suit, forcing the sale at the $164,325 price. Upon losing the suit for specific performance, the plaintiff brought an action for damages on theories of negligence, fraud, breach of contract, and unlawful trade practices against the realtor. The realtor defended against the suit, arguing that the statute of limitations had run. On appeal, the plaintiff claimed that her cause of action did not accrue until she was forced to convey her property at a loss. The defendant argued that the cause of action accrued when the plaintiff learned the actual market value of the land. On those facts, the Oregon Supreme Court held:
"Plaintiff acknowledges that she became aware of the error in valuation four months after she signed the contract to convey. At that point, plaintiff was contractually obliged to convey the property at a loss of approximately $235,675, a loss she attributed to defendant's faulty valuation. * * * Plaintiff's argument that she sustained no harm until the extent of her damage was ascertained, or, in this case, until an appellate decision finally forced her to convey the property, mixes two discrete concepts, the occurrence of harm and the extent of damages. * * * Plaintiff's contractual obligation itself constituted harm. The earnest money agreement was an established liability, notwithstanding potential contract defenses."
Jaquith , 297 Or. at 788, 687 P.2d 1083.
Defendant reads Jaquith to stand for the proposition that any unwanted contractual obligation is, necessarily, harm, regardless of whether there is any basis on which to assess that harm. But, such a reading upends the *506 principle that "[i]n every case actual damages sustained must be established by evidence upon which their existence and amount may be determined with reasonable certainty. Speculative damages are never allowed." Parker v. Harris Pine Mills, Inc. , 206 Or. 187, 197, 291 P.2d 709 (1955).
In Jaquith , the "contractual obligation" that "constituted harm" was a known obligation, for a known economic loss. It was clearly measurable. There was no uncertainty-plaintiff was obligated to sell the land at *816 a price that was verified to be below market value. In Jaquith , the contractual obligation, and its known and measurable consequences, constituted the harm. In marked contrast, defendant's argument here would make immediately actionable any undesirable contract provision, no matter how minor, without any means of measuring its consequences or even knowing if that provision would ever have a real consequence to the parties. That theory renders harm too speculative, dependent upon prognostications of potential future events that may, or may not, occur.
Second, defendant argues that plaintiff knew it was damaged the moment it realized the contract was not as profitable as anticipated. According to defendant, the contract inhibited plaintiff from "being free to respond to the marketplace by buying whatever cups and lids it wanted, whenever it wanted them, at whatever price it could negotiate, and from whomever could offer the most attractive terms." In making this argument, we understand defendant to define harm, for purposes of tort, to include what, in economics, is termed an opportunity cost.
In economic terms, each choice made in the market typically implies the rejection of an alternative choice. In other words, because of limited time and resources, a person cannot engage in every deal available, no matter if each is profitable. The choice to engage in one deal necessitates, at least theoretically, the forced rejection of other, potentially lucrative deals due to resource constraints. When the first choice turns bad, the "cost" of that choice is not simply the loss incurred by making that choice, but also what would have been gained, through the second best, but untaken, choice. These lost opportunities can, sometimes, *507 be quantified and sought as damages in some legal actions. See, e.g. , Robert Cooter & Melvin Aron Eisenberg, Damages for Breach of Contract , 73 Cal. L. Rev. 1432 (1985) ; Richard Bronaugh, Symposium: Jurisprudential Perspectives on Contracts, Lost Opportunities and Contract Damages , 17 Val. U. L. Rev. 735 (1983).
The fundamental problem with defendant's argument is that it relies upon an academic economics concept-one grounded in theory-and seeks to apply it in the more practical legal situation of a lawsuit. For an economist, opportunity costs always exist in every contract, every choice, every regretted decision. Defendant asks us to assume lost opportunity costs always exist and, therefore, whether sought or not as damages, they lurk, unseen, to trigger harm for purposes of a statute of limitations.
Like defendant's previous argument, this relegates harm to speculation. In Jeffries v. Mills , 165 Or. App. 103, 116, 995 P.2d 1180 (2000), we held that "[plaintiff] may have had a basis to be concerned before that date that she would lose her stock or otherwise not prevail in the bankruptcy proceeding. But until the court's actual entry of an order to that effect, the injury could at most be contemplated as a possibility." Our decision in Jeffries reiterated the Oregon Supreme Court's explanation in Davies that " '[t]he threat of future harm, not yet realized, is not enough' " for an action for negligence to accrue. Davies , 274 Or. at 668, 548 P.2d 966 (quoting Prosser, The Law of Torts 143-44 (4th ed. 1971)).
Opportunity costs are the type of harm that can be contemplated as a "mere possibility" but are not present in every case. And while there may always exist, in economic theory, opportunity costs of choices not made, and paths not traveled, those lost opportunities are not always measurable in damages. While opportunity costs might well be recoverable in certain circumstances, when pleaded and proven, they were expressly not sought by plaintiff in this case, nor were they put at issue by the evidence in the summary judgment record. Plaintiff never alleged that the contract defendant approved cost plaintiff alternative business, impaired plaintiff's ability to contract with others, or caused plaintiff to decline a profitable, competing offer. Here, on this record, *508 defendant was not entitled to summary judgment on the theory that plaintiff had suffered harm measurable in damages and derived from opportunity cost theory.
Finally, defendant argues that plaintiff knew it was harmed when it chose to breach its contract with Pact. According to defendant, plaintiff made a conscious choice to breach the agreement and any reasonable person should have known at that point that *817 the intentional breach of the contract with Pact would lead to legal and financial consequences, and that, therefore, plaintiff knew of the harm when it chose to breach the agreement.
Unlike defendant's other theories, the problem with this more traditional conceptualization of harm is not that it is speculative. It is certainly reasonable to expect that, in most instances, a person would know that the intentional breach of a commercial agreement would result in harm. However, under the facts of this case, defendant's third argument as to harm suffers from a different problem-causation.
In the light most favorable to plaintiff, the applicable standard on summary judgment, the evidence in the record is that plaintiff believed it could breach the contract without repercussions, because of the advice offered by defendant. Plaintiff offered evidence that it was defendant who proposed to respond to Pact that the contracts were legally unsound because "in Oregon you can't have a contract that's only terminated by one party" and that the contracts were nonenforceable, "non-standard distribution contracts."
Those assurances by defendant-that the contract was unenforceable and, therefore, that an intentional breach of the agreement would carry no harmful consequence-creates a genuine issue of material fact as to whether plaintiff knew, at the time it walked away from the Pact contract, that defendant's tortious conduct would, in fact, cause plaintiff harm.
"As Davies demonstrates, when a client receives advice from a lawyer, the client does not necessarily act unreasonably in trusting that advice. A lawyer is in a relationship of trust and confidence to a client. * * * When a potential tortfeasor is in a relationship of trust and confidence *509 to a plaintiff and makes assurances to the plaintiff, those assurances may have a bearing on whether a reasonable person would be aware of a substantial possibility of tortious conduct."
Kaseberg , 351 Or. at 279, 265 P.3d 777 (internal citations and quotation marks omitted).
In this case, plaintiff sought damages directly related to costs incurred in defending a lawsuit for breach of contract. In the light most favorable to plaintiff, the termination of the contract, which constituted the breach, came as a result of advice provided by defendant that ending the contract would have no negative consequence for plaintiff. The operative point in time for assessing harm is when plaintiff knew, or should have known, that defendant's actions resulted in damages. On this record, a reasonable trier of fact could determine that time to be when plaintiff learned from new counsel that defendant's assurances of escaping the contract unscathed were incorrect. That occurred in April 2013, within the statute of limitations. The trial court therefore erred in granting summary judgment.
Reversed and remanded.