SERCOMBE, S. J., dissenting.
The issue under review is whether plaintiffs satisfied their burden of going forward with evidence under ORCP 47 C, that, but for defendants' negligence, plaintiffs would have obtained a more favorable settlement of their asserted and unasserted claims in the two mediations. The majority concludes that plaintiffs presented sufficient evidence to discharge that burden, reversing the trial court's legal conclusions that the proffered evidence of a more favorable settlement was inadmissible and that the proof of loss was speculative. The majority determines that evidence of the terms of the settlement agreement between the parties, together with the assertions in the Burrows and Gores declarations *625 that plaintiffs did not receive any of the New Flyer settlement funds because they did not bring a claim against New Flyer, was sufficient by itself to discharge plaintiffs' burden of proof under ORCP 47 C, and to establish a prima facie case that plaintiffs suffered an ascertainable loss because of defendants' negligence.
I disagree with the majority's analysis of the evidence. In my view, the evidence was insufficient to prove that the settlors would probably have settled the case more favorably to plaintiffs if defendants had filed products-liability claims on plaintiffs' behalf. There was no direct *855 evidence of the reasons for the actual settlement amounts or the rationale for the allocations of the entire $4 million settlement fund and the $2 million Tri-Met payment fund. Without that evidence, a factfinder cannot forecast whether different factual assumptions would drive a different settlement. I dissent from the majority's conclusion that proof of a likely, hypothetical settlement under different facts can be made without any evidence of the parties' settlement intent in making the actual deal.
Plaintiffs pleaded that, had defendants timely filed products-liability claims on their behalf, the products-liability settlors would have increased their payouts by 16.25 percent-plaintiffs' actual allocation of the Tri-Met payout-and paid that increase to plaintiffs. Alternatively, plaintiffs argued that, had the claims been made, 16.25 percent of the New Flyer, Rosco, and Hadley settlement funds that were paid would have been allocated to plaintiffs and that lesser amounts of those funds would have been paid to the other claimants. Both theories of recovery rest upon an unsupported factual premise-that the parties allocated the Tri-Met settlement fund (as opposed to allocating the entire $4 million settlement fund) based, in part, on each claimant's proportionate share of the total incurred damages, so that the 16.25 percent Tri-Met allocation to plaintiffs represented their likely share of any settlement. Plaintiffs treat the allocation of the Tri-Met payment as a template for the hypothetical distribution of other settlement funds. Plaintiffs seek damages of 16.25 percent of the actual New Flyer, Rosco, and Hadley settlement funds, or the amount of additional funds that those settlors might have paid.
In my view, there is no evidence to support that factual premise-the assumption that the parties allocated plaintiffs' share of the entire $4 million settlement fund on the basis of plaintiffs' claims against Tri-Met alone. The attorney declarations submitted by plaintiffs omit any such assertion. And the fact of that allocative intent could have been easily attested to by Burrows and Gores in their declarations (if it were true). Both of those declarants represented parties in the mediation and participated in the allocation discussions.
*856 In fact, the evidence of the settlement agreement, and the testimony of the attorney for two of the three main claimants, suggests a different distributive intent-one where the parties allocated the $4 million fund based, in part, on the parties' proportionate shares of the total incurred damages, both to settle the pleaded claims against Tri-Met and New Flyer as well as the contribution claims by Tri-Met against New Flyer for plaintiffs' recovery, and then accounted for plaintiffs' $325,000 share as funded by Tri-Met's contribution. The allocation mediation session more likely resulted in the distribution of funds from Tri-Met and New Flyer based on the parties' share of the composite $4 million fund, rather than, as concluded by the majority, being based on the number of claimants against New Flyer.
Under ORCP 47 C, in summary judgment proceedings "[t]he adverse party has the burden of producing evidence on any issue raised in the motion as to which the adverse party would have the burden of persuasion at trial." See also OEC 307(2) ("The burden of producing evidence as to a particular issue is initially on the party with the burden of persuasion as to that issue.").
After defendants moved for summary judgment on plaintiffs' malpractice claims, plaintiffs had the burden of going forward with evidence to prove causation and damages. We reaffirmed the causation standard for legal malpractice cases in *626 Watson v. Meltzer , 247 Or. App. 558, 565-66, 270 P.3d 289 (2011), rev. den. , 352 Or. 266, 286 P.3d 1231 (2012) (quoting Jeffries v. Mills , 165 Or. App. 103, 122, 995 P.2d 1180 (2000) ): " 'To show causation in a legal malpractice action, a plaintiff must demonstrate that she would have obtained a more favorable result' but for the negligence of the defendant." That same causation standard has been applied in cases alleging an unfavorable settlement because of attorney negligence. See Filbin v. Fitzgerald , 211 Cal. App. 4th 154, 166, 149 Cal.Rptr.3d 422, 432 (2012) ("The plaintiff must also establish that[,] but for the alleged malpractice, settlement of the underlying lawsuit would have resulted in a better outcome."); Slovensky v. Friedman , 142 Cal. App. 4th 1518, 1528, 49 Cal.Rptr.3d 60, 67 (2006) ("Thus, a plaintiff who alleges an inadequate *857 settlement in the underlying action must prove that, if not for the malpractice, she would certainly have received more money in settlement or at trial.").
Thus, the issue on review is whether plaintiffs satisfied their burden under ORCP 47 C to produce admissible evidence to show that it was more probable than not that, had the products-liability claims been made by defendants, the three products-liability settlors would have settled the dispute in a particular way that was more favorable to plaintiffs than the actual distribution of funds.
As noted, there was no evidence from any of the parties or their attorneys on the reasons why the Tri-Met fund was allocated in the manner that it was, or the likelihood that the Tri-Met allocation reflected the overall damage shares of each of the parties. The trial court concluded:
"There is a complete lack of evidence from either the payors of settlement funds or the persons dividing the funds as to whether they would have, or even might have, behaved differently if additional plaintiffs had been involved in the claims against the products liability defendants."
The evidence of the settlement negotiations was meager. In December 2012, Rosco settled with the products-liability defendants for $225,000 with the Sale estate, the Hammel estate, and Gittings each receiving $75,000. In February 2013, Hadley settled with the three products-liability claimants for $300,000, paying the Sale estate, the Hammel estate, and Gittings each $100,000. Nothing more is known about those negotiations and settlements, beyond the terms of the executed releases.
Tri-Met, New Flyer, and the claimants mediated the amount of the Tri-Met and New Flyer settlements separately from the later claimant mediation of the amounts to be paid from the funds to claimants. According to Rick Pope, the attorney for the Sale estate, and Gittings, "[i]n June 2013, all the parties conducted a mediation with Judge Lyle Velure. *** The parties on August 11, 2013 reached agreement on a global settlement figure in payment of all claims. *** [A]ll the plaintiffs settled with all remaining defendants Tri-Met, Day and New Flyer for $4 million, *858 consisting of a $2 million payment from New Flyer and a $2 million payment from Tri-Met."
The amount of the $4 million settlement fund, referenced by Pope, appears to have not been affected by the number of claimants making claims against New Flyer. The majority recognizes that, "at the time that plaintiffs and the products-liability claimants entered into their agreement with New Flyer and Tri-Met to settle for $4 million, neither plaintiffs nor the products-liability claimants knew what share of the New Flyer and Tri-Met settlement funds they would receive." 296 Or. App. at 851, 441 P.3d at 623. The settlement agreement among the parties recites that a "global settlement" of $4 million was reached "without any specific distribution [of the $4 million] contemplated by the parties."
Put another way, the contribution of $4 million by Tri-Met and New Flyer was made without regard to "any specific distribution" to the parties-that is, without regard to the number of potential claims that could be paid from that fund to the five claimants. Rather than showing that New Flyer would have increased its $2 million payment if additional products-liability claims had been filed, the evidence shows the contrary-that is, that the $2 million New Flyer settlement was made without regard to the number of claims made against it or otherwise to accommodate a particular distribution to the claimants.
*627 Instead, the evidence was that other factors affected the amount of money paid in settlement by Tri-Met and New Flyer. According to Pope, the factors affecting the settlement amount agreed to by Tri-Met and New Flyer, included the $1 million cap on the total damage claims from a single occurrence against Tri-Met under the Oregon Tort Claims Act (OTCA), ORS 30.272 (2009), whether and the degree to which the injured claimants had uncapped remedies against the individual Tri-Met defendants, the potential allocation to New Flyer of excess claims against Tri-Met if New Flyer's fault was greater than 25 percent under ORS 31.610(3) (especially problematic given that the "evidence of Tri-Met's wrongdoing was so overpowering that Plaintiffs ran a substantial risk of prevailing against New Flyer on a percentage of fault less than 25 percent"), and *859 the capped liability of the settlors to the two wrongful death claimants.[1] Pope's testimony was the only evidence of the factors considered by the parties in arriving at a $4 million settlement.
There was no evidence that the amount of funds that either Tri-Met or New Flyer paid in settlement was determined by the number of claims against each of the them. In fact, a contrary inference is more easily drawn. Tri-Met paid the same amount in settlement as New Flyer, even though five claimants filed tort claims against Tri-Met and three claimants asserted tort claims against New Flyer.[2]
Nor can the probability of additional settlement funds from New Flyer, Hadley, and Rosco as a result of the first settlement amount mediation be inferred from the actual allocation of the settlement funds in the later allocation mediation. What Tri-Met and New Flyer presently intended when they contributed funds in the first global mediation could not have been affected by a later mediation among different parties about different issues. Thus, there was no evidence to support plaintiffs' pleaded theory of causation and damages-that New Flyer would have paid more than $2 million in settlement had plaintiffs brought products-liability claims against it.
*860 The distribution of the $4 million settlement was mediated by all five claimants after the settlors fixed their settlement amounts in the first mediation. The five claimants divided the $4 million into two $2 million settlement funds. The parties agreed that Tri-Met would pay its $2 million settlement contribution to the Sale estate (in the amount of $524,150, representing 26.2 percent of the proceeds to be paid), the Hammel estate ($603,911, representing 30.2 percent), Gittings ($546,939, representing 27.4 percent), and the Hammels ($325,000, representing 16.25 percent). The claimants then allocated the New Flyer $2 million payment to be paid to the Sale estate (in the amount of $625,850, representing 31.3 percent of the proceeds to be paid), the Hammel estate ($721,089, representing 36 percent), and Gittings ($653,061, representing 32.7 percent). The New Flyer payment allocation among the Sale estate, the Hammel estate, and Gittings is the same as the Tri-Met payment allocation among just those parties. From that parity, plaintiffs *628 imply that the settling parties would have divided the New Flyer fund differently, probably along the lines of the division of the Tri-Met fund, had all products-liability claims been brought, and that plaintiffs would have received an additional $325,000.[3]
There was insufficient evidence that a more favorable division of the $4 million payments would have occurred. Two scenarios could have occurred. The parties could have taken the $4 million in settlement funds (as well as the earlier Hadley and Rosco funds) and divided compensation among the five claimants in rough proportion to each claimant's share of the total pleaded and likely damages of all five claimants. Plaintiffs' share of the $4 million settlement would be paid from the Tri-Met fund, and the remaining three claimants would be paid from the remaining portion of the Tri-Met fund, the New Flyer fund, and the *861 earlier Hadley and Rosco funds. Plaintiffs' recovery would be the same, $325,000, whether it was paid from one fund or four. That scenario is consistent with the facts.
Plaintiffs posited a different and less likely scenario-that the Tri-Met and New Flyer funds were divided to compensate the respective claimants against each settlor proportionate to their incurred damages against each particular settlor. That scenario is less consistent with the facts.
The total pleaded damages for all claimants was $33,250,000 ($10 million each for the Sale estate, the Hammel estate, and Gittings; $1,600,000 for Ryan Hammel; and $1,650,000 for Jamie Hammel). The entire recovery from all four funds for all claimants was $4,525,000 with the Sale estate obtaining $1,325,000, the Hammel estate recovering $1,500,000, Gittings receiving $1,375,000, and each of the Hammels recovering $162,500. To discern the distributive intent of the parties, it is useful to compare each party's share of the total pleaded damages (that party's proportionate compensatory need) with that party's share of the $2 million Tri-Met payment fund, and the party's share of the $4 million overall settlement fund:
Party % of % of % of Pleaded Damages Tri-Met Fund Total Fund Sale estate 30.1% 26.2% 28.7% Hammel estate 30.1% 27.4% 33.1% Gittings 30.1% 30.2% 30.0% R. Hammel 4.8% 8.1% 4.1% J. Hammel 4.9% 8.1% 4.1%
This comparison suggests that the parties' proportionate compensatory needs were considered and used in the apportionment of the total settlement fund and that plaintiffs' share of the Tri-Met payment fund was increased to allow for that proportionate compensation. The actual distribution of the Tri-Met fund over-compensated plaintiffs compared with the compensation paid to the two estates and Gittings. A comparison of each claimant's percentage of the recovery of the Tri-Met fund to that claimant's *862 pleaded damage percentage suggests that, except for the Gittings distribution, the Tri-Met fund was not allocated to the claimants in proportion to their incurred damages. Instead, plaintiffs received more from the Tri-Met payment fund than they would if Tri-Met were allocating its share applying the same considerations to all five claimants.
The overall settlement is more consistent with the proportion of damages pleaded in *629 the complaints than is the Tri-Met allocation. The recovery in each individual case, as a percentage of the total recovery, is generally consistent with the pleaded damages in each individual case as a percentage of the total pleaded damages. The consistency between the pleaded and the agreed-to damages makes it more likely than not that the parties intended to distribute the $4 million payment fund consistently with the overall harm incurred by the claimants, without regard to whether the claimants had filed all actionable causes of action.
At the very least, plaintiffs' predicate fact that the $2 million Tri-Met fund was divided according to the proportions of the five damages claims asserted against Tri-Met was improbable, and the evidence was insufficient to discharge plaintiffs' burden of going forward with that evidence under ORCP 47 C. Thus, the terms of the settlement and the Pope testimony do not prove that it was likely that, had defendants filed products-liability claims, the New Flyer fund would have paid plaintiffs an ascertainable amount of money.
Plaintiffs next claim that evidence beyond the settlement terms presented issues of fact on causation and damages that precluded summary judgment for defendants. The majority relies on parts of two declarations by two attorneys who were involved in the settlement discussions. In her declaration, Burrows declared that the divided New Flyer money "otherwise would have gone to [plaintiffs]" and that, because the division of the New Flyer fund was in the same proportions as the division of the Tri-Met fund as to the Sale estate, the Hammel estate, and Gittings, "if McCulloch had made product liability claims against New Flyer, then Ryan and Jamie Hammel would have received $325,000 of the New Flyer money, just as they had received *863 $325,000 of the Tri-Met money." Burrows also explained that, because Ryan Hammel gave "powerful" deposition testimony (prior to the mediations) on his emotional distress damages from witnessing the death of his sister, the settling defendants "probably would paid more than the $2 million, $300,000, and $225,000 they did pay." Hala Gores, attorney for the Hammel estate, declared that plaintiffs did not participate in the distribution of the New Flyer, Hadley, or Rosco funds "because their attorney, Mark McCulloch, did not make claims against New Flyer, Rosco and Hadley." She also opined that, had Ryan and Jamie Hammel made claims against the products-liability settlors, that "New Flyer would have paid more than $2,000,000 to settle the claims against it," "Rosco would have paid more than $225,000, and Hadley would [have] paid more than $300,000 to settle the claims against [it]."
Defendants moved to strike those and other allegations in the Burrows and Gores declarations. As noted, in its letter opinion, the trial court ruled:
"The court does not see any foundation for the statements in these declarations relating to the matter at issue here. *** The motives and behaviors about which the declarants here would testify are either hearsay (that is, based on statements made by the other plaintiffs or insurance company representatives to the declarants), incompetent, or speculative."
That ruling was correct.[4] In testifying about the probable settlement posture of the products-liability defendants, Burrows and Gores opined as lay witnesses. Lay opinion testimony is limited to testimony that is "rationally based on the perception of the witnesses" and "helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue." OEC 701 ; see also OEC 602 (witness testimony must be based on "personal knowledge of the matter"). The opinion testimony by a lay witness that the settlors would have increased the funds tendered for settlement *864 or would have divided those funds differently must be "based on the perception of the witness," that is, on the perceptions of the declarant about the settlors. Here, the declarations about how the New Flyer fund would have been divided were not based on any perception *630 of the declarant about the settlors past settlement intent.
Beyond the conclusory opinions in the declarations about hypothetical distributions, the only evidence that the settlors would have increased the settlement funds is Burrows's declaration in which she states that:
"[i]t is my opinion that Ryan Hammel's deposition testimony was so powerful that it lifted the value of all the cases, especially of the Hammels' case, and that if McCulloch had made claims against New Flyer, Hadley, and Rosco, these defendants probably would have paid more than the $2 million, $300,000, and $225,000 they did pay. Hammel['s] 16.25% share of such increased funds would have further increased their settlements."
Burrows opines that, based on her observations of plaintiff Ryan Hammel's "powerful" deposition testimony on his emotional distress damages, the products-liability settlors would have paid an unknown amount of additional money to settle all claims. Burrows rests her opinion not on her perceptions of the motives or actions of the settlors, but on the convincing quality of the proof of Ryan's emotional distress damages. That is an insufficient foundation for the opinion under OEC 701.[5]
This same requirement of personal knowledge of settlement intent, rather than opinion evidence, was applied to a legal malpractice claim in Bryant v. Bryan Cave, LLP , 400 S.W.3d 325, 336, 341 (Mo. Ct. App. 2013), the plaintiff alleged losses stemming from a negligently drafted ante-nuptial agreement. There, rejecting both lay and expert *865 opinion testimony that the wife would likely have agreed to different terms, the court determined that the plaintiff had not met his burden of proof on causation: "The opinion evidence *** as to whether [wife] would have agreed to the provisions at issue is inadmissible at trial, and cannot serve as a basis for satisfying [plaintiff's] evidentiary burden in a summary judgment proceeding." Id. at 336.
Similarly, Oregon case law confirms that evidence of causation must be based on personal knowledge, and not rest on unsupported opinion or speculation. For example, in Davis v. County of Clackamas , 205 Or. App. 387, 134 P.3d 1090 (2006), the plaintiff motorcycle driver was injured in an intersection collision with another vehicle and later brought claims against the corner property owner and tenants, as well as the county, for failing to clear vegetation that impeded her view of the oncoming vehicle. Id. at 389, 134 P.3d 1090. After the defendants moved for summary judgment on the issue of causation, the plaintiff submitted a police report that quoted her as saying that she did not see the approaching car because "a bush was in the way and obscured her view." Id. at 390, 134 P.3d 1090. The plaintiff testified she stopped and then pulled out further to see because of the blockage. Id. She later equivocated. An affiant testified that, in his opinion, the bush blocked the view. Id . at 392, 134 P.3d 1090.
We concluded that the police officer's testimony as to the cause of the accident was not admissible "because he did not have personal knowledge of the circumstances that caused it." Id. at 395, 134 P.3d 1090. The opinion testimony was inadmissible because the affiant was not applying specialized knowledge or expertise. Id. The police report was inadmissible hearsay. Therefore, there was no evidence on causation and summary judgment for the defendants was proper. Id . at 398, 134 P.3d 1090. Those same limitations apply to the inadmissible opinions in this case that the settlors would have paid more in settlement if more products-liability claims had been filed. Those opinions were not based on personal knowledge or expertise. As was the case in Davis , summary judgment for defendants was proper.
Plaintiffs' attorney in the malpractice case declared that he had retained "an unnamed *631 qualified expert" who *866 is "available and willing to testify and who has actually rendered an opinion or provided facts which, if revealed by affidavit or declaration, would be a sufficient basis for denying the motion for summary judgment" under ORCP 47 E. Plaintiffs argue that the declaration suffices to preclude summary judgment for defendants. At the summary judgment hearing, plaintiffs represented that their retained expert would testify that insurance companies predictably resolve only the claims asserted against their insureds. That expert opinion will not resolve the factual question of whether these particular products-liability settlors would have paid more to the Hammels if products-liability claims had been filed. Resolution of that fact question requires personal knowledge of the actions of the settlors during the first mediation proceeding, not the application of expertise.
We reached that result in Deberry v. Summers , 255 Or. App. 152, 296 P.3d 610 (2013). In that legal malpractice case, the plaintiff alleged that the defendant attorney failed to include a provision in a trust or will that would have carried out the settlor's intended distribution to the plaintiff. Id. at 154, 296 P.3d 610. The defendant had prepared a trust agreement that placed into trust a number of homes for the benefit of named individuals, including holding the Canyon Court home in trust for the plaintiff's granddaughter. Id. at 154-55, 296 P.3d 610. Later, the settlor sold the Canyon Court home, but did not change the beneficiary designation. Id. at 155, 296 P.3d 610. The defending attorney claimed that he did not have an agreement with the settlor to include a replacement home in the distribution to the plaintiff and was, therefore, entitled to summary judgment on whether he was negligent in failing to carry out the settlor's intentions. Id. at 156, 296 P.3d 610. The plaintiff countered with an ORCP 47 E declaration. Id .
We affirmed the trial court's allowance of summary judgment in the defendant's favor:
"The filing of an affidavit under ORCP 47 E precludes summary judgment only where expert opinion evidence is required to establish a genuine issue of material fact. Expert opinion evidence is necessary and helpful to a jury's understanding of the nature and scope of a lawyer's professional duty of care to a client, see, e.g. , Abraham v. T. Henry Construction, Inc. , 230 Or. App. 564, 217 P.3d 212 (2009), *867 aff'd , 350 Or. 29, 249 P.3d 534 (2011) (affidavit submitted under ORCP 47 E to create genuine issue of material fact as to whether defendant breached a standard of care in construction). However, the existence of an agreement by defendant to prepare testamentary instruments that would ensure that plaintiff inherited any home in which she might reside at the time of Dorothy's death, including the West View Court home, is a fact question that requires personal, not expert knowledge. See Gwin v. Lynn , 344 Or. 65, 74, 176 P.3d 1249 (2008) (distinguishing between a witness's knowledge as an expert and personal knowledge of facts). Plaintiff does not assert that she has retained an expert witness who has personal knowledge that defendant made such an agreement with Dorothy. In such circumstances, the filing of a declaration under ORCP 47 E did not preclude summary judgment."
Deberry , 255 Or. App. at 163, 296 P.3d 610 (emphasis in original); see also Hunsinger v. Graham , 288 Or. App. 169, 186, 404 P.3d 1004 (2017) (expert testimony cannot create a question of fact on a point where personal knowledge is necessary).
The same holds true here. The existence of an intent by the settlors to more completely compensate plaintiffs is a fact issue that requires personal, not expert knowledge. An opinion on insurance industry settlement practices is irrelevant to whether New Flyer, Rosco, and Hadley would have, in these particular circumstances, settled for more. The trial court did not err in granting summary judgment to defendants, notwithstanding the filing of an ORCP 47 E declaration.
Finally, summary judgment in favor of defendants was proper because plaintiffs failed to produce evidence that the amount of their claimed damages could be determined with reasonable certainty. As noted in Merchants Paper Co. v. Newton , 292 Or. App. 497, 506, 424 P.3d 811 (2018), "[i]n every case actual damages sustained must be established by *632 evidence upon which their existence and amount may be determined with reasonable certainty. Speculative damages are never allowed." (Quoting Parker v. Harris Pine Mills, Inc. , 206 Or. 187, 197, 291 P.2d 709 (1955).) As noted, the amount of money available to settle plaintiffs' claims was a function of a number of variables including the OTCA cap *868 on the liability of Tri-Met, limitations on the recovery of the estates' wrongful death claims against both Tri-Met agents and the products-liability settlors, the contribution liability and comparative fault of New Flyer, and the strength of the claimants' negligence and products-liability claims. How all of those variables would work if one of them (the number of asserted claims) changed may not be capable of calculation. The specific damages cannot be inferred from evidence of general harm. Merchants Paper Co. , 292 Or. App. at 505-06, 424 P.3d 811 (imputed general harm insufficient to prove damages with reasonable certainty).
In sum, plaintiffs failed their ORCP 47 C burden of going forward with admissible evidence to show that it was more probable than not that Hadley, Rosco, and New Flyer would have paid an additional ascertainable amount in settlement had plaintiffs' product-liability claims been filed or that the parties would have paid plaintiffs more from the actual settlements. Plaintiffs failed to introduce admissible evidence to show that the settlors intended to compensate plaintiffs from the $2 million Tri-Met fund in proportion to all parties' claims against Tri-Met as opposed to compensation proportionate to plaintiffs' share of the entire $4 million fund. Without proof of the parties' actions in negotiating and entering into the settlement, plaintiffs failed to prove how the settlement would have occurred if supplemental facts or actions occurred.
This lack of foundation undercuts the testimony of Burrows and Gores that the New Flyer fund would have been distributed in the same way as the Tri-Met fund if the additional tort claims had been filed. The opinions were not stated to be based on personal knowledge of the parties' intent in allocating the Tri-Met fund and are inadmissible under OEC 602 and 701.
The Burrows and Gores declarations are perhaps more significant in what they do not say, than in what those declarations state. Both declarants conclude that plaintiffs would have been paid from the New Flyer fund if they had filed claims against New Flyer. Neither declarant, however, attested to the necessary factual predicate to that conclusion-the reasons the parties agreed to the $4 million *869 settlement and the Tri-Met apportionment. That information was known to the declarants, because both of them represented parties to the mediations. The omission of that evidence is fatal to the continued viability of plaintiffs' claims.
In sum, the evidence of a more favorable outcome was not presented by plaintiffs. The evidence that was presented was conclusory and speculative, and insufficient to establish causation and loss. As noted by one commentator,
"[a] claim regarding an inadequate settlement often fails because it is inherently speculative. Negligence cannot be predicated on speculation that the attorney or another attorney could have secured a more advantageous settlement or the fortuitous event that a jury instead of a judge may have returned a higher award. A client, who was a plaintiff, must establish not only that concluding such a settlement fell outside the standard of care, but also what would have been a reasonable settlement and that such sums would have been agreed to and could have and would have been paid."
Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractice , § 30.41, at 582-85 (5th ed. 2000).
I dissent from the majority's conclusions that evidence of the creation of the four settlement payment funds and the allocation of those funds in different proportions to five claimants, together with conclusory and unsupported opinions in the filed declarations, is sufficient evidence by itself to prove the probability of a deal that was not made-viz. , the creation of four settlement funds with substantial additional proceeds from three of the settlors or the distribution of each of the *633 funds in the same proportion as the Tri-Met fund allocation.

The amount paid in settlement by Tri-Met and New Flyer potentially reflected the contribution liability of New Flyer to any amounts paid as damages by Tri-Met to plaintiffs, as well as the direct liability of the settlor to each of the claimants. The failure to bring a claim against the products-liability defendants during the two-year period of limitations may not extinguish any claim for contribution that Tri-Met could make against the products-liability defendants for excess payment of plaintiffs' claims. The right of contribution exists among joint tortfeasors "even though judgment has not been recovered against all or any of them." ORS 31.800(1). The right of contribution exists when "a tortfeasor *** has paid more than a proportional share of the common liability." ORS 31.800(2). The recovery is "limited to the amount paid by the tortfeasor in excess of the proportional share." Id . Contribution to settlements can be obtained from another tortfeasor whose liability for the injury or wrongful death is extinguished by the settlement. ORS 31.800(3) ; see Jensen v. Alley , 128 Or. App. 673, 677, 877 P.2d 108 (1994) (setting forth the elements of a claim for contribution under ORS 31.800 ). ORCP 22 C allows the filing of a third-party complaint to obtain contribution as a matter of right within 90 days after service of the complaint. Otherwise, a third-party plaintiff must obtain consent of the parties and the court to make a later claim.

In addition, all five claimants brought claims against the Tri-Met defendants under 42 USC section 1983 in federal district court. Those claims were settled with the tort claims.

In her declaration, Michelle Burrows, plaintiffs' successor attorney in the malpractice case, explained:
"Significantly, the distribution of New Flyer's $2 million was not a renegotiation by the attorneys and clients involved. Instead, it was a simple duplication of the Tri-Met negotiations, without the Hammels. Thus, I can say with confidence that if McCulloch had made product liability claims against New Flyer, then Ryan and Jamie Hammel would have received $325,000 of the New Flyer money, just as they had received $325,000 of the Tri-Met money."

Although plaintiffs complain that the trial court "erred in ignoring [their] ORCP 47 E and other declarations and deposition testimony," they did not assign as error the evidentiary rulings just noted. Under ORAP 5.45, plaintiffs' complaints that the trial court erred in not considering the Burrows and Gores declarations cannot be "considered on appeal."

Burrows's opinion that Ryan Hammel's deposition testimony, given before the August 2013 mediations, increased the value of his asserted and unasserted claims, compared with the value of Jamie Hammel's claim, is not supported by the facts. The parties actually settled Ryan's claims for $162,500, the same sum as agreed to be paid to settle Jamie's claims, notwithstanding Ryan's purported proof of additional, special damages. The settlements occurred several months after the deposition of Ryan Hammel. Presumably, the effect of that testimony on claims evaluation was reflected in the settlement that actually occurred.